**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | |
| | **CHAPTER 11** |
| **UNITED MOBILE SOLUTIONS, LLC,** | |
| | **CASE NO. 16-62537-bem** |
| Debtor. | |

**SECOND AMENDED DISCLOSURE STATEMENT**
**FOR PLAN OF REORGANIZATION**

**Dated this 16th day of May, 2017**

**Filed by:**

**UNITED MOBILE SOLUTIONS, LLC**

**Debtor and Debtor in Possession**

**Attorneys for Debtor in Possession:**

**Leon S. Jones**
**Cameron M. McCord**
**JONES & WALDEN, LLC**
**21 Eighth Street, NE**
**Atlanta, Georgia 30309**
**(404) 564-9300**

## I.    Introduction and General Information

This Second Amended Disclosure Statement ("Disclosure Statement") is submitted by United Mobile Solutions, LLC ("Debtor"), to provide information to parties in interest about the Chapter 11 Plan ("Plan") filed by Debtor. This introductory section is qualified in its entirety by the detailed explanations which follow and the provisions of the Plan.

This Disclosure Statement sets forth certain information regarding Debtor's prepetition history and events that have occurred during Debtor's Chapter 11 case. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and voting procedures that holders of Claims in Impaired Classes must follow for their votes to be counted.

**Parties voting on the Plan should read both the Plan and this Disclosure Statement.**

### A.    Definitions

Unless otherwise defined, capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan. In the event of an inconsistency between the Disclosure Statement and the Plan, the terms of the Plan shall govern and such inconsistency shall be resolved in favor of the Plan. The Filing Date, as defined in the Plan, shall mean July 20, 2016, and the Effective Date, as defined in the Plan, shall mean the date that is 60 days after the entry of a Confirmation Order.

### B.    The Disclosure Statement

The primary purpose of this Disclosure Statement is to provide parties entitled to vote on the Plan with adequate information so that they can make a reasonably informed decision prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court's approval of this Disclosure Statement constitutes neither a guaranty of the accuracy or completeness of the information contained herein, nor an endorsement of the Plan by the Bankruptcy Court.

When and if confirmed by the Bankruptcy Court, the Plan will bind Debtor and all holders of Claims against and Interests in Debtor, whether or not they are entitled to vote or did vote on the Plan and whether or not they receive or retain any Distributions or property under the Plan. Thus, you are encouraged to read this Disclosure Statement carefully. In particular, holders of Impaired Claims who are entitled to vote on the Plan are encouraged to read this Disclosure Statement, the Plan, and any exhibits to the Plan and Disclosure Statement, carefully and in their entirety before voting to accept or reject the Plan. This Disclosure Statement contains important information about the Plan, the method and manner of distributions under the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning this case.

## II.    Voting on the Plan  and Confirmation Process

### A.    Voting Instructions

Accompanying this Disclosure Statement are copies of the following documents: (1) the Plan; and (2) a Ballot to be executed by holders of Claims in Classes 1 through 12 to accept or reject the Plan.  The Ballot contains voting instructions.  Please read the instructions carefully to ensure that your vote will count.

The Disclosure Statement, the form of Ballot, and the related materials delivered together herewith (collectively, the "Solicitation Package"), are being furnished to Holders of Claims in Classes 1 through 12 for the purpose of soliciting votes on the Plan.

If you did not receive a Ballot in your Solicitation Package, and believe that you should have received a Ballot, please contact Jones & Walden, LLC, 21 Eighth Street, NE, Atlanta, Georgia 30309, (404) 564-9300 (Attn: Cameron McCord, Esq.).

**In order for your Ballot to count, it must be received within the time indicated on the Ballot and the Ballot must clearly indicate your Claim, the Class of your Claim and the amount of your Claim.**

**By enclosing a Ballot, Debtor is not admitting that you are entitled to vote on the Plan, is not admitting that your Claim is allowed as set forth on the Ballot, and is not waiving any right to object to your vote or your Claim.**

### B.    Who May Vote

Only a holder of an Allowed Claim classified in an Impaired Class is entitled to vote on the Plan.  As set forth in section 1124 of the Bankruptcy Code, a class is "Impaired" if legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered.

Any class that is "unimpaired" is not entitled to vote to accept or reject a plan of reorganization and is conclusively presumed to have accepted the Plan.

A Claim must be "allowed" for purposes of voting in order for such creditor to have the right to vote.  Generally, for voting purposes a Claim is deemed "allowed" absent an objection to the Claim if (1) a proof of claim was timely filed, or (ii) if no proof of claim was filed, the Claim is identified in Debtor's Schedules as other than "disputed," "contingent," or "unliquidated," and an amount of the Claim is specified in the Schedules, in which case the Claim will be deemed allowed for the specified amount.  In either case, when an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or allows the Claim for voting purposes.

Debtor in all events reserves the right through the claim reconciliation process to object to or seek to disallow any claim for distribution purposes under the Plan.

### C.    Requirements of Confirmation

The Bankruptcy Court can confirm the Plan only if all the requirements of § 1129 of the Bankruptcy Code are met.  Those requirements include the following:

1. The Plan classifies Claims and Interests in a permissible manner;

2. The contents of the Plan comply with the technical requirements of the Bankruptcy Code;

3. The Plan has been proposed in good faith and not by any means forbidden by law;

4. The disclosures concerning the Plan are adequate and include information concerning all payments made or promised in connection with the Plan, as well as the identity, affiliations, and compensation to be paid to all officers, directors, and other insiders; and

5. The principal purpose of the Plan is not the avoidance of tax or the avoidance of the securities laws of the United States.

In addition to the confirmation requirements described above, Debtor hopes that the Plan will be approved by all Impaired Classes of Claims entitled to vote.  If, however, the Plan has not been approved by all Impaired Classes of Claims, the Court may nevertheless "cram down" the Plan over the objections of a dissenting Class.  The Plan may be "crammed down" so long as it does not discriminate unfairly, is fair and equitable with respect to each dissenting Class of Claims, and at least one Impaired Class has voted in favor of the Plan without regard to any votes of insiders.  If necessary, Debtor will seek to "cram down" the Plan.

### D.    Acceptance or Rejection of the Plan and Cram Down

The Class containing your Claim will have accepted the Plan by the favorable vote of a majority in number and two-thirds in amount of Allowed Claims actually voting.  In the event that any Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan if an Impaired Class accepts it and if, as to each Impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." If you hold an Allowed Secured Claim, the Plan is fair and equitable if: (a) you retain your lien and receive deferred cash payments totaling the allowed amount of your Allowed Secured Claim, (b) the collateral is sold and your Lien attaches to the proceeds of the sale, or (c) you are otherwise provided with the "indubitable equivalent" of your Allowed Secured Claim.  If you hold a Claim that is not an Allowed Secured Claim, and is not entitled to priority under § 507 of the Bankruptcy Code, the Plan is fair and equitable if you receive property of a value equal to the allowed amount of your Claim or if no junior Class receives or retains under the Plan on account of such junior interest any property.

### E.    Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan ("Confirmation Hearing") at the time indicated in the Order Conditionally Approving this Disclosure Statement and providing Notice of Confirmation Hearing (the "Solicitation Order"). The Confirmation Hearing may be adjourned from time to time without further notice except for announcement at the Confirmation Hearing or notice to those parties present at the Confirmation Hearing.

### F.    Objections to Confirmation

As will be set forth in the Solicitation Order, any objections to confirmation of the Plan must be in writing, set forth the objector's standing to assert any such objection, and must be filed with the Bankruptcy Court and served on counsel for Debtor.  The Solicitation Order contains all relevant procedures relating to the submission of objections to confirmation and should be reviewed in its entirety by any party who has an objection to confirmation.

### G.    Whom to Contact for More Information

If you have any questions about the procedure for voting on your Claim or the packet of materials you received, please contact Cameron M. McCord at Jones & Walden, LLC at the address indicated below or by telephone at (404) 564-9300.

If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact Jones & Walden, LLC by one of the following methods:

| | | |
|---|---|---|
| Via U.S. Mail: | Via Facsimile: | Via Email: |
| Jones & Walden, LLC | (404) 564-9301 | arich@joneswalden.com |
| 21 Eighth Street, NE | Attn: Amanda Rich | |
| Atlanta, GA 30309 | | |
| Attn:  Amanda Rich | | |

## III.    Historical Background

### A.    Description of Debtor

Debtor is a Georgia for profit limited liability company founded in 2010.  Prior to the Petition Date, Debtor's business consisted of three divisions including (i) a wholesale division, (ii) a refurbishing division, and (iii) operations as a carrier master dealer for both T-Mobile USA, Inc. ("T-Mobile"), MetroPCS Georgia, LLC ("MetroPCS GA"), and MetroPCS Texas, LLC ("MetroPCS TX"). As part of its reorganization, Debtor shut down its wholesale and refurbishing operations and is focused on its operations as a carrier master dealer.  Currently, Debtor operates as a master dealer for 41 cellular retail stores. Specifically, the Debtor operates

(a) 13 T-Mobile stores with 10 sub-dealer locations and 3 direct operated locations (details regarding the T-Mobile stores including location and designation are attached hereto as Exhibit "B"), (b) 17 MetroPCS GA stores with 12 sub-dealer locations and 5 direct operated locations (details regarding the MetroPCS GA stores including location and designation are attached hereto as Exhibit "C"), and (c) 11 MetroPCS TX stores with 5 sub-dealer locations and 6 direct operated locations (details regarding the MetroPCS TX stores including location and designation are attached hereto as Exhibit "C"). Upon expiration of the T-Mobile Dealer Agreements (as defined below) on November 1, 2017, the Debtor will wind down its T-Mobile affiliated stores in accordance with its assumed contractual obligations to T-Mobile for the orderly and efficient disposition of the T-Mobile stores that Debtor operates directly (e.g., either by closing the stores, transferring them to a third party, or becoming a sub-dealer if approved by T-Mobile) or as a master dealer to various sub-dealers (i.e., releasing sub-dealers to select a new master dealer approved by T-Mobile) and retain only its MetroPCS GA and MetroPCS TX operations. As a condition precedent to confirmation of the Plan, unless otherwise agreed in writing in advance by T-Mobile, MetroPCS GA, or MetroPCS TX, as applicable to the particular store location, the Debtor will become the named tenant instead of iTalk Inc., the Debtor's subsidiary Italk Lease Management, LLC, or other entity under the lease for every store that it directly operates or that is subleased to a subdealer.   The Debtor will assign its leasehold interests at the T-Mobile stores to new dealers or subdealers as may be designated by T-Mobile without further need for Court approval.   The Debtor employs approximately 41 people with 10 corporate employees and 31 retail positions.

### B.        Ownership of the Debtor

In or around September 2015, the Debtor's shares were transferred to United Mobile Solutions Corp., a Delaware Corporation, for purposes of facilitating an acquisition of both United Mobile Solutions Corp. ("UMS Corp"), and the Debtor by Italk, Inc. a Nevada for profit public corporation ("Italk"). On or about September 24, 2015, Italk entered into a purchase and sale agreement ("Agreement") by and between Italk as buyer and Kil W. Lee a/k/a David Lee ("Lee") as seller[1].  Pursuant to the Agreement, Italk agreed to acquire from Lee all of the UMS Corp issued and outstanding common stock in exchange for shares of Italk's preferred stock, convertible into 85% of the Italk's fully diluted common stock (the "Stock Issuance").   The details of the Agreement and the Stock Issuance were detailed in the Form 8-K Italk filed with the SEC on September 28, 2015. The Form 8-K can be found through the SEC search engine: https://www.sec.gov/edgar/searchedgar/companysearch.html.

In order to effectuate the Agreement, Italk must have the ability to issue preferred stock. Italk does not have authority to issue multiple stock classes.  As a Nevada Corporation, Italk must comply with the provisions of Nevada Revised Statutes ("NRS") Chapter 78, which is Nevada's general for-profit corporations act. Pursuant to NRS 78.195(1), "the articles of

---

[1] Upon execution of the Agreement, Lee was elected as the President of Italk and appointed to serve on its board of directors. After being informed that deal could not close, Lee resigned from Italk. David F. Levy is the Chief Executive Officer of Italk as well as Chairman of the Board of Directors, Treasurer, and secretary.  Richard Dea also serves as a director of Italk.  Neither Levy nor Dea are involved with UMS as of February 2017.  Both individuals understand that the agreement will be rescinded.

incorporation must prescribe, or vest authority in the board of directors to prescribe" various provisions pertaining to multiple classes of stock. Here, no such provision exists in Italk's original 2006 Articles of Incorporation or the 2012 Articles of Merger. Thus, Italk does not have properly delegated authority under its Article of Incorporation for its Board to designate Series A or Series B preferred stock and cannot issue the preferred stock referenced in the Agreement. As a result of this, while Italk is currently the legal shareholder of UMS Corp. and its subsidiary, the Debtor, Lee has a potential claim against Italk to rescind the Agreement and return to his position as the sole shareholder of UMS Corp., the parent of the Debtor. Pursuant to the corporate resolution filed in this Case (DN. 3), Lee is the designated officer of the Debtor to take any and all actions with regards to the Bankruptcy Case. The issues that have arisen with the Agreement do not affect the Debtor's corporate authorization to file the Petition or prosecute the Bankruptcy Case.

Notwithstanding the foregoing, the Debtor contemplates the acquisition of its reorganized shares by KHC, LLC upon confirmation of the Plan. This transaction is more detailed Article 6.12 below.

### C.       Pre and Post-Petition Management

Debtor is currently managed by Kil Won Lee, Debtor's president. Mr. Lee receives an annual salary of $180,000.00 per year. Upon confirmation of the Plan, Mr. Lee will continue to manage the reorganized debtor and will receive the same salaries as they did pre-petition.

### D.       Prepetition Assets and Liabilities

a.       Debtor's assets as of the Filing Date consist of:

| Asset | Scheduled Value |
|---|---|
| PNC Bank | $13,966.06 |
| Bank of America | $0 |
| Accounts Receivable | $72,299.93 |
| Cellular Accessories and Phones | $89,562 |
| Office Furniture | $5,000 |
| Office Fixtures | $7,500 |
| GMC Box Truck | $6,000 |
| 2012 Toyota Prius | $6,148 |
| Manual Fork Lift | $500 |
| cpdmobile.com; united mobile solutions.com | $0 |
| Total | $200,975.99 |

b.       Debtor's pre-petition liabilities as of the Filing Date consist of secured claims in the amount of $2,799,715.94 and general unsecured claims in the amount of $2,651,137.85.

## IV.    The Chapter 11 Case

### A.    Reasons for Filing Chapter 11

As stated above, prior to the Petition Date, Debtor's business consisted of three divisions including (i) a wholesale division, (ii) a refurbishing division, and (iii) operations as a carrier master dealer. Beginning in 2013, Debtor suffered a severe loss of revenue in both its wholesale and refurbishing divisions. Debtor purchased approximately $800,000.00 worth of cellular devices for the purposes of refurbishing and selling. The vast majority of such goods were past the point of refurbishing and caused the collapse of Debtor's refurbishing and wholesale division. This lack of revenue caused the Debtor to fall behind on payments to its creditors. Debtor has since shut down its refurbishing and wholesale divisions.  The Chapter 11 was filed in order for the Debtor to gain control of its operations and collections and to reorganize its debts.

### B.    Professionals

On July 20, 2016, Debtor filed an application requesting authorization to retain the law firm of Jones & Walden, LLC to serve as bankruptcy counsel in this Case. The Court entered an Order approving the application.

### C.    Financial Projections

Attached hereto as Exhibit "A" is the Debtor's 2 year pro-forma. The pro-forma utilizes a cash basis and was prepared by Debtor's president, Kil W. Lee and the Debtor's controller, Michael Thomason.

## V.    Summary of the Plan

**The following summary of the Plan provides only a brief description of its provisions.  The summary is qualified in its entirety by the more detailed descriptions of the Plan in the Disclosure Statement and by the terms of the Plan itself.**

The Plan provides for payments to creditors of Debtor.  Debtor believes that any alternative to confirmation of the Plan, such as liquidation, would result in significant delays, litigation, job loss and/or impaired recoveries. **For these reasons, Debtor urges you to return your Ballots accepting Debtor's Plan.**

The Plan contemplates the reorganization and ongoing business operations of Debtor and the resolution of the outstanding Claims against and Interests in Debtor pursuant to sections 1129(b) and 1123 of the Bankruptcy Code.  The Plan classifies all Claims against and Interests in Debtor into separate Classes.

## VI.    Description of the Plan

### A.    Retention of Property by Debtor

Upon confirmation, Debtor will retain all of the property of the estate free and clear of liens, claims, and encumbrances not expressly retained by Creditors. Debtor will have the rights and powers to assert any and all Causes of Action (defined as all causes of action, choses in action, claims, rights, suits, accounts or remedies belonging to or enforceable by Debtor, including Avoidance Actions, whether or not matured or unmatured, liquidated or unliquidated, contingent or noncontingent, known or unknown, or whether in law or in equity, and whether or not specifically identified in Debtor's schedules). Debtor specifically reserves any cause of action related to other monies or receivables due. However, Debtor is not reserving any Causes of Action against the T-Mobile Affiliates other than any rights to payment of commissions or other Compensation under the T-Mobile Dealer Agreements, the MetroPCS GA Dealer Agreements, and the MetroPCS TX Dealer Agreements and any other Causes of Action will be released as to the T-Mobile Affiliates. Neither the Disclosure Statement nor Plan shall be deemed a waiver of any right of Debtor to collect any receivable or right to payment under any applicable laws.  Debtor expressly reserves the right to exercise any and all remedies available to Debtor regarding its accounts receivable or rights to payment at law or in equity, at such time or times as Debtor from time to time may elect. The Disclosure Statement and Plan are filed with a full reservation of rights.

### B.    Parties Responsible for Implementation of the Plan

Upon confirmation, Debtor will be charged with administration of the Case.  Debtor will be authorized and empowered to take such actions as are required to effectuate the Plan. Debtor will file all post-confirmation reports required by the United States Trustee's office.  Debtor will also file the necessary final reports and will apply for a final decree as soon as practicable after substantial consummation of the Plan, the completion of the claims analysis and objection process.  Debtor may be authorized to reopen this case after the entry of a Final Decree to enforce the terms of the Plan including for the purpose of seeking to hold a party in contempt or to enforce the confirmation or discharge injunction or otherwise afford relief to Debtor.  The fee associated with the Debtor's motion to reopen Debtor's case may be waived, and Debtor may not be responsible for payment of such to the Clerk of Court for the Bankruptcy Court of the Northern District of Georgia or otherwise.

### C.    Liabilities of Debtor

Debtor will not have any liabilities except those expressly assumed under the Plan. Debtor will be responsible for all ongoing expenses and payments due and owing under the confirmed Plan upon the terms provided in the confirmed Plan.

### D.    Funding of the Plan

The source of funds for the payments pursuant to the Plan is the continued operation of Debtor as a carrier master dealer for MetroPCS GA and MetroPCS TX.  Debtor is currently

operating as a master dealer for a total of 41 cellular retail stores. While 13 of those stores are T-Mobile stores which will wind down by the end of 2017, Debtor has accounted for this in its pro-forma and believes that its continued operations without these stores will still lead to a viable and successful plan of reorganization. Debtor intends to continue to operate its 28 MetroPCS stores, and while MetroPCS is not allowing the Debtor to open any additional stores during the remainder of the Bankruptcy Case, Debtor hopes that upon emergence from bankruptcy it will be able to open additional MetroPCS locations post-reorganization. Although neither MetroPCS GA nor MetroPCS TX has approved or given any indication that it will approve, Debtor hopes to add 50 MetroPCS subdealer locations in 2017 and 50 additional MetroPCS subdealer locations in 2018. Debtor believes there are existing subdealers waiting to add locations post-bankruptcy and new subdealers in various markets ready to open stores post-bankruptcy, and Debtor has undertaken an internal effort to vet even more potential subdealers for the stores. Debtor's goal is to expand its MetroPCS market beyond Texas, the Carolinas, and Georgia. Debtor intends to fund administrative expenses and provide operating capital to the Reorganized Debtor from the New Value in Class 12.

### E.    Provisions Regarding Executory Contracts

**<u>T-Mobile USA, Inc.</u>**

Debtor is a party to the following executory contracts with T-Mobile USA, Inc. ("T-Mobile") as more particularly described in Proof of Claim 16 filed by T-Mobile on October 16, 2016 ("POC 16") (collectively the "T-Mobile Dealer Agreements"):

     i.      Wholesale Agent Agreement for Exclusive Sub-Dealer Distribution, effective November 1, 2015, as amended by the EIP/Consignment Amendment to the Wholesale Agent Agreement for Exclusive Sub-Dealer Distribution, effective date November 1, 2015;

     ii.     Exclusive Prepay Agency Agreement with Exclusive Sub-Dealers For EPP Locations, effective date May 1, 2014;

     iii.    GoSmart Mobile Agency Agreement with Exclusive Sub-Dealers, effective date February 1, 2013, as extended by the Notice of Extension of the GoSmart Mobile Agency Agreements dated December 29, 2015; and

     iv.    GoSmart Mobile Agency Agreement, effective date February 1, 2013, as extended by the Notice of Extension of the GoSmart Mobile Agency Agreements dated December 29, 2015.

As of the Petition Date, the Debtor was indebted to T-Mobile in the amount of $15,879.26 for inventory T-Mobile sold to the Debtor under the T-Mobile Dealer Agreements. T-Mobile satisfied that amount by recoupment after the Petition Date against commissions it owed to the Debtor under the T-Mobile Dealer Agreements. To the best of Debtor's knowledge, Debtor has remained current on its post-Petition obligations to T-Mobile during the pendency of the Case and no other pre-Filing Date obligations have arisen. Accordingly, Debtor is not aware of any arrearage or necessity to cure. To the extent that T-Mobile or the Debtor become aware of any pre-Filing Date obligations or other obligations that have accrued or continue to accrue during the pendency of the Bankruptcy Case, such obligations will be paid in full in cash on the

Effective Date of the Plan. On the Effective Date, Debtor intends on assuming the T-Mobile Dealer Agreements.  Pursuant to 11 U.S.C. §365(c)(1), such assumption requires T-Mobile's consent which the Debtor has yet to obtain. Debtor is aware that even with the consent of T-Mobile regarding the assumption of the T-Mobile Dealer Agreements, that the T-Mobile Dealer Agreements will expire without renewal, or may even be terminated early in accordance with their terms, as follows: (1) the ESDP Agreement will expire without renewal on November 1, 2017, (2) the EPP Agreement expired without renewal on May 1, 2017, and (3) the GoSmart Exclusive Agreement and the GoSmart Agreement will each expire without renewal on January 31, 2018. Upon the non-renewal of the foregoing T-Mobile Dealer Agreements, the Debtor intends to work with T-Mobile at T-Mobile's direction for the orderly and efficient disposition of the T-Mobile stores that Debtor operates directly or as a Master Dealer to various sub-dealers.  A detailed list of the T-Mobile stores is attached hereto as Exhibit "B".  On the Effective Date, Debtor may also reject one or more of the T-Mobile Dealer Agreements.

## MetroPCS Georgia, LLC

Debtor is party to the following executory contracts with MetroPCS Georgia, LLC ("MetroPCS GA") as more particularly described in Proof of Claim 12 filed by MetroPC GA on October 12, 2016 ("POC 12").

i.   Exclusive Indirect Dealer Agreement (EPP to MetroPCS), effective date April 18, 2016 [Authorized Dealer Area: Charlotte, NC];

ii.  Exclusive Indirect Dealer Agreement, effective date May 2, 2016 [Authorized Dealer Area: Nashville, TN]; and

iii. Exclusive Indirect Dealer Agreement (EPP to MetroPCS), effective date April 18, 2016 [Authorized Dealer Area: Atlanta, GA].

(collectively the "MetroPCS GA Dealer Agreements").

As of the Petition Date, the Debtor was indebted to MetroPCS GA in the amount of $40,418.90 (i.e., $28,285.75 on account number 1174 and $12,133.15 on account number 1194) for inventory MetroPCS GA sold to the Debtor under the MetroPCS GA Dealer Agreements. MetroPCS GA satisfied that amount by recoupment after the Petition Date against commissions it owed to the Debtor under the MetroPCS GA Dealer Agreements. To the best of Debtor's knowledge, Debtor has remained current on its post-Petition obligations to MetroPCS GA during the pendency of the Case and no other pre-Filing Date obligations have arisen.  Accordingly, Debtor is not aware of any arrearage or necessity to cure.  To the extent that MetroPCS GA or the Debtor become aware of any pre-Filing Date obligations or other obligations that have accrued or continue to accrue during the pendency of the Bankruptcy Case, such obligations will be paid in full in cash on the Effective Date of the Plan. On the Effective Date, Debtor intends on assuming the MetroPCS GA Dealer Agreements.  Pursuant to 11 U.S.C. §365(c)(1), such assumption requires MetroPCS GA's consent which the Debtor has yet to obtain. Moreover, to the extent that MetroPCS GA consents to the assumption of the MetroPCS GA Dealer Agreements, MetroPCS GA retains its unilateral right to terminate the MetroPCS GA Dealer Agreements on 120 days' written notice without cause. A detailed list of the MetroPCS GA

stores is attached hereto as Exhibit "C".  On the Effective Date, Debtor may also reject one or more of the MetroPCS GA Dealer Agreements.

## MetroPCS Texas, LLC

Debtor is party to the following executory contract with MetroPCS Texas, LLC ("MetroPCS TX") as more particularly described in Proof of Claim 13 filed by MetroPC TX  on October 12, 2016 ("POC 13") (collectively the "MetroPCS TX Dealer Agreements").

     i.     Exclusive Indirect Dealer Agreement (EPP to MetroPCS), effective date April 18, 2016 [Authorized Dealer Area: Dallas, TX];

     ii.    Exclusive Indirect Dealer Agreement, effective date May 26, 2016 [Authorized Dealer Area: South Central Region]; and

     iii.   Indirect Dealer Agreement (Non-Exclusive), effective date May 20, 2016 [Authorized Dealer Area: South Central Region].

As of the Petition Date, the Debtor was indebted to MetroPCS TX in the amount of $5,024 (account number 1183) for inventory MetroPCS TX sold to the Debtor under the MetroPCS TX Dealer Agreements. MetroPCS TX satisfied that amount by recoupment after the Petition Date against commissions it owed to the Debtor under the MetroPCS TX Dealer Agreements. To the best of Debtor's knowledge, Debtor has remained current on its post-Petition obligations to MetroPCS TX during the pendency of the Case and no other pre-Filing Date obligations have arisen.  Accordingly, Debtor is not aware of any arrearage or necessity to cure.  To the extent that MetroPCS TX or the Debtor become aware of any pre-Filing Date obligations or other obligations that have accrued or continue to accrue during the pendency of the Bankruptcy Case, such obligations will be paid in full in cash on the Effective Date of the Plan. On the Effective Date, Debtor intends on assuming the MetroPCS TX Dealer Agreements.  Pursuant to 11 U.S.C. §365(c)(1), such assumption requires MetroPCS TX's consent which the Debtor has yet to obtain. Moreover, to the extent that MetroPCS TX consents to the assumption of the MetroPCS TX Dealer Agreements, MetroPCS TX retains its unilateral right to terminate the MetroPCS TX Dealer Agreements on 120 days' written notice without cause. A detailed list of the MetroPCS TX stores is attached hereto as Exhibit "C".  On the Effective Date, Debtor may also reject one or more of the MetroPCS TX Dealer Agreements.

## St. Paul Fire and Marine Insurance Company

Debtor is a party to a lease (the "Lease") between St. Paul Fire and Marine Insurance Company ("Landlord") and Debtor, as tenant, dated January 25, 2010 and amended on November 22, 2010 ("First Amendment"), August 21, 2012 ("Second Amendment"), June 3, 2013 ("Third Amendment") and September 8, 2015 ("Fourth Amendment") (as amended, the "Lease") for premises located at: (i) 6140-A Northbelt Parkway, Norcross, Gwinnett County, Georgia (the "6140-A Premises") and (ii) 6135-G Northbelt Parkway, Norcross, Gwinnett County, Georgia (the "6135-G Premises") (collectively the 6140-A Premises and the 6135-G Premises are referred to herein a the "Premises").   The Lease additionally references premises located at 6140-B Northbelt Parkway, Norcross, Georgia and 6115-B Jimmy Carter Boulevard, Norcross, Georgia; however, the Lease expired regarding such premises pre-petition and Debtor

no longer occupies such premises. Debtor is current on its pre-Filing Date obligations under the Lease, and Debtor has remained current during this Case.  Accordingly, Debtor is not aware of any arrearage or necessity to cure.  On the Effective Date, Debtor shall assume the Lease.

**Sub-Lease**

Debtor is a party to a sub-lease with Eco Global, Inc. ("Sub-Lease") pursuant to which Debtor is Sub-Landlord and Eco Global, Inc. is Sub-Tenant for the 6135-G Premises (as described above under St. Paul Fire and Marine Insurance Company).   On the Effective Date, Debtor shall assume the Sub-Lease.

**Italk Lease Management, LLC**

Either iTalk, Inc. or the Debtor's wholly owned subsidiary, Italk Lease Management, LLC, is the lessee for certain T-Mobile, MetroPCS GA, and MetroPCS TX stores.  The Debtor occupies the premises where it operates stores directly on a month to month basis without any formal documentation.  As a condition precedent to confirmation of the Plan, unless otherwise agreed in writing in advance by T-Mobile, MetroPCS GA, or MetroPCS TX, as applicable to the particular store location, the Debtor will become the named tenant instead of iTalk Inc., the Debtor's subsidiary Italk Lease Management, LLC, or other entity under the lease for every store that it directly operates or that is subleased to a subdealer.

**Sub-Dealer Agreements**

The Debtor is a party to unwritten subdealer agreements as to the T-Mobile stores with Contact Communications, Inc., Media Total Service, LLC, Infinitas Ventures, LLC, HJ Telecom Inc., High Tech Wireless Plus, Inc., and CellRich Corp.  The Debtor has subdealer agreements for the MetroPCS GA business with Table Top Communications LLC and DM Communication Network, but does not have written subdealer agreements with A and M Mobile, Diverse Mobile, or Metro Dealer Inc. For its MetroPCS TX business, the Debtor has subdealer agreements with INT Telecom and Ambar Technology LLC.  Subject to the consent of T-Mobile, MetroPCS GA, and MetroPCS TX, the Debtor will enter into written subdealer agreements with subdealers who do not have existing subdealer agreements or ratify post-Filing Date subdealer agreements as a condition precedent to confirmation and assume existing subdealer agreements on the Effective Date.

Any unexpired leases or executory contracts which are not assumed herein or hereunder or are the subject of a pending motion to assume as of the Effective Date shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code on the Effective Date.  A proof of claim for damages arising from such rejection must be filed in compliance with the Bankruptcy Rules on or before thirty (30) days after the Effective Date.  Any claims which are not timely filed will be disallowed and discharged.

### F.    Avoidance Actions and Retained Rights

The Plan provides that Debtor shall retain all rights of action against others.  The Plan also provides that Debtor shall retain "Avoidance Actions" under Chapter 5 of the Bankruptcy Code. Debtor holds the following potential claims:

i.    The Debtor holds potential claims for monies paid to officers of Italk, Inc. for consultation fees paid during the year prior to the filing of the Petition pursuant to 11 U.S.C. §§ 547 and 548 of the Bankruptcy Code;

ii.    Debtor also has potential preference claims against various trade vendors pursuant to 11 U.S.C. § 547. Such payments may be subject to avoidance as preferential transfers. Debtor has not determined whether defenses exist to any such claims, such as where such transfers were made in the ordinary course of business or where the creditor provided subsequent new value;  and

iii.    Debtor also holds objections to claims of the following creditors who have asserted claims in the Bankruptcy Case:
   a.  Tech Data Corporation;
   b.  Galaxy Wireless;
   c.  Moin Telecom, LLC;
   d.  Small Business Credit Corp;
   e.  Ursa Information Systems.
   Debtor is in the process of performing a cost analysis of the prosecution of the objections to the claims of the creditors versus the payment to creditors under the plan.

The Debtor is not aware of any potential non-bankruptcy litigation that could occur post-petition.

The Debtor is in the process of analyzing the validity of the claims of creditors listed on its schedules as well as the filed proofs of claim.  To the extent that Debtor disputes the validity of any such claims, Debtor will undergo the business analysis of the cost of prosecuting the same versus the benefit the estate would receive and proceed accordingly.

Debtor may also have Claims against others which are retained.  Notwithstanding the foregoing, Debtor is reviewing records but is not aware of any fraudulent conveyance claims.

### G.    Treatment of Claims and Interests

A brief summary of the Classes, the treatment of each Class, and the voting rights of each Class is set forth below.  A complete description of the treatment of each Class is set forth in Article 4 of the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of claim. Debtor reserves the right to object to any and all claims.

14

Debtor reserves the right to pay any claim in full at any time in accordance with the terms of the Plan (i.e. at the percentage distribution designated in the Plan and including any accrued and unpaid interest, if any) without prepayment penalty.

**6.1    Class 1**:          **Secured or Priority Tax Claim of the Internal Revenue Service**

The Internal Revenue Service ("IRS") filed proof of claim number 5, which was amended on September 15, 2016, to reflect a claim in the amount of $0.00.  Debtor is not aware of any claim held by the IRS.  The Court established October 17, 2016, as the Bar Date for filing proofs of claim. The Bar Date has passed.  Accordingly, any claim asserted or assertable by the IRS on or before the Filing Date (the "Class 1 IRS Tax Claim") shall: (i) be time barred and fixed at $0.00 and (ii) any claim assessable or due and payable on or prior to the Filing Date shall be disallowed in its entirety and forever discharged.  However, in the event the Court determines the IRS holds an Allowed Class 1 IRS Tax Claim, Debtor shall pay such Allowed Class 1 IRS Tax Claim in full within 60 months of the Filing Date in equal monthly payments commencing on the Effective Date and continuing by the 28th day of each subsequent month (or the next Business Day if the 28th day is not a Business Day) with interest accruing at the annual rate of 4% unless the IRS agrees to a lower interest rate or longer payment term.  Any third-party payments or payments in excess of the scheduled distribution pursuant to Class 1 received by IRS after the Filing Date shall be applied to the principal tax obligation owed by Debtor pursuant to Class 1. To the extent the Class 1 IRS Tax Claim is asserted to be a secured claim, Debtor shows that no equity exists in Debtor's assets to attach to the IRS's security interest or lien upon Debtor's property and such shall be cancelled and void upon entry of the Confirmation Order.

A failure by the Debtor to make a payment under Class 1 to the IRS pursuant to the terms of the Plan shall be an event of default as to the IRS.  In the event of a default under Class 1, the IRS must send a Default Notice to Debtor in accordance with Article 2.3 of the Plan. Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default and the address for payment, which will accept overnight deliveries.  Receipt by Debtor's Attorney shall not be deemed receipt by Debtor of the required Default Notice.  In the event of an uncured default following proper Default Notice procedures and opportunity to cure pursuant to Article 2.3 of the Plan, the IRS may (a) enforce the entire amount of its then outstanding Allowed Class 1 IRS Tax Claim; (b) exercise any and all rights and remedies it may have under applicable non-bankruptcy law regarding the Allowed Class 1 IRS Tax Claim; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

The amount of any claim of the IRS that is not otherwise assessable or due and payable on or prior to the Effective Date, and the right of the IRS, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the IRS would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code.  However, the rights and treatment of the IRS and obligations and liability of Debtor or its property regarding any claim of the IRS against Debtor which was assessable or due and payable prior to the Effective Date shall be treated and fixed in accordance with the Plan, and any additional, other claims assessable or

15

due and payable prior to the Effective Date and not timely asserted by the IRS in accordance with the Bankruptcy Code and the Plan and in all instances prior to entry of the Confirmation Order, shall be forever barred. Debtor reserves the right to pay any tax claim in full at any time.

The Claim of the Class 1 Creditor is Impaired by the Plan and the holder of the Class 1 Claim is entitled to vote to accept or reject the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves the right to object to any and all claims.

**6.2    Class 2**:        **Secured or Priority Tax Claim of Georgia Department of Revenue**

Debtor listed the Georgia Department of Revenue ("GDR") for notice only in its schedules of liabilities. Debtor is not aware of any claim held by the GDR. The Court established October 17, 2016, as the Bar Date for filing proofs of claim. The Bar Date has passed and the GDR has not filed a proof of claim. Accordingly, any claim asserted or assertable by the GDR on or before the Filing Date (the "Class 2 GDR Tax Claim") shall: (i) be time barred and fixed at $0.00 and (ii) any claim assessable or due and payable on or prior to the Filing Date shall be disallowed in its entirety and forever discharged. However, in the event the Court determines the GDR holds an Allowed Class 2 GDR Tax Claim, Debtor shall pay such Allowed Class 2 GDR Tax Claim in full within 60 months of the Filing Date in equal monthly payments commencing on the Effective Date and continuing by the 28th day of each subsequent month (or the next Business Day if the 28th day is not a Business Day) with interest accruing at the annual rate of 12% unless the GDR agrees to a lower interest rate or longer payment term. Any third-party payments or payments in excess of the scheduled distribution pursuant to Class 2 received by GDR after the Filing Date shall be applied to the principal tax obligation owed by Debtor pursuant to Class 2. To the extent the Class 2 GDR Tax Claim is asserted to be a secured claim, Debtor shows that no equity exists in Debtor's assets to attach to the GDR's security interest or lien upon Debtor's property and such shall be cancelled and void upon entry of the Confirmation Order.

A failure by the Debtor to make a payment under Class 2 to the GDR pursuant to the terms of the Plan shall be an event of default as to the GDR. In the event of a default under Class 2, the GDR must send a Default Notice to Debtor in accordance with Article 2.3 of the Plan. Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default and the address for payment, which will accept overnight deliveries. Receipt by Debtor's Attorney shall not be deemed receipt by Debtor of the required Default Notice. In the event of an uncured default following proper Default Notice procedures and opportunity to cure pursuant to Article 2.3 of the Plan, the GDR may (a) enforce the entire amount of its then outstanding Allowed Class 2 GDR Tax Claim; (b) exercise any and all rights and remedies it may have under applicable non-bankruptcy law regarding the Allowed Class 2 GDR Tax Claim; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

The amount of any claim of the GDR that is not otherwise assessable or due and payable on or prior to the Effective Date, and the right of the GDR, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the GDR would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code. However, the rights and treatment of the GDR and obligations and liability of Debtor or its property regarding any claim of the GDR against Debtor which was assessable or due and payable prior to the Effective Date shall be treated and fixed in accordance with the Plan, and any additional, other or amended claims assessable or due and payable prior to the Effective Date and not timely asserted or amended by the GDR in accordance with the Bankruptcy Code and the Plan and in all instances prior to entry of the Confirmation Order, shall be forever barred. Debtor reserves the right to pay any tax claim in full at any time.

The Claim of the Class 2 Creditor is Impaired by the Plan and the holders of the Class 2 Claim is entitled to vote to accept or reject the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves the right to object to any and all claims.

### 6.3    Class 3:    Priority and Secured Tax Claims of Governmental Units Not Otherwise Classified in the Plan

Class 3 shall consist of any Priority or Secured Claim of a governmental unit entitled to priority under 11 U.S.C. §507(a)(8), which are not otherwise specifically classified in the Plan ("Class 3 Governmental Unit Priority Tax Claim"). Debtor is not aware of any Holders of Class 3 Governmental Unit Priority Tax Claim not otherwise classified in the Plan. In the event any governmental unit asserts a secured tax claim pursuant to Class 3, Debtor shows that its assets are fully encumbered and no value exists to attach to such security interest or lien upon Debtor's property and such shall be cancelled and void upon entry of the Confirmation Order. Debtor may file the Confirmation Order on the lien records as evidence of this cancellation. In the event there are Allowed Holders of Class 3 Governmental Unit Priority Tax Claims, Debtor shall pay such Allowed Class 3 Government Unit Priority Tax Claims at the rate of $100 per month commencing on the Effective Date and continuing by the 28th day of each subsequent month (or the next Business Day if the 28th day is not a Business Day), with interest accruing at the annual rate of 3.5% or such other rate as required by the Bankruptcy Code, with a final balloon payment on the 5th anniversary of the Filing Date (i.e. March 9, 2021). Debtor reserves the right to pay any Class 3 Governmental Unit Priority Tax Claim in full at any time.

A failure by the Debtor to make a payment under Class 3 to a Holder of an Allowed Class 3 Governmental Unit Priority Tax Claim pursuant to the terms of the Plan shall be an event of default as to the applicable Holder. In the event of a default under Class 3, the applicable Holder must send a Default Notice to Debtor in accordance with Article 2.3 of the Plan. Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default and the address for payment, which will accept overnight deliveries. Receipt by Debtor's Attorney shall not be deemed receipt by Debtor of the

required Default Notice.  In the event of an uncured default following proper Default Notice procedures and opportunity to cure pursuant to Article 2.3 of the Plan, the applicable Holder may (a) enforce the entire amount of its then outstanding Allowed Class 3 Governmental Unit Priority Tax Claim; (b) exercise any and all rights and remedies it may have under applicable non-bankruptcy law regarding the Allowed Class 3 Governmental Unit Priority Tax Claim; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

The amount of any claim of a governmental unit that is not assessed or assessable on or prior to the Effective Date, and the right of the particular governmental unit, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the particular governmental unit would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code if applicable. However, the rights and treatment of a governmental unit and obligations and liability of Debtor or its property regarding any claim of a governmental unit against Debtor which was assessable or due and payable prior to the Effective Date shall be treated and fixed in accordance with the Plan, and any additional, other or amended claims assessable or due and payable prior to the Effective Date and not timely asserted or amended by a governmental unit in accordance with the Bankruptcy Code and the Plan and in all instances prior to entry of the Confirmation Order, shall be forever barred.  Debtor reserves the right to pay any tax claim in full at any time.

The Holder of an Allowed Class 3 Governmental Unit Priority Tax Claim is impaired and entitled to vote to accept or reject the Plan.  Nothing contained herein shall prohibit Debtor from objecting to the Class 3 Claims for any reason.

### 6.4    Class 4:        Secured Claim of T-Mobile USA, Inc.

Class 4 consists of the secured claim of T-Mobile USA, Inc. ("T-Mobile") (the "Class 4 Secured Claim").  On October 14, 2016, T-Mobile filed proof of claim number 16 which refers to certain dealer agreements (collectively the "T-Mobile Dealer Agreements") further described as follows:

i.      Whole Agent Agreement, effective November 1, 2015, as amended by the EIP/Consignment Amendment to the Wholesale Agent Agreement for Exclusive Sub-Dealer Distribution, effective date November 1, 2015;

ii.     Exclusive Prepay Agency Agreement with Exclusive Sub-Dealers For Epp Locations, effective May 1, 2014;

iii.    GoSmart Mobile Agency Agreement with Exclusive Sub-Dealers, effective date February 1, 2013, as extend by the Notice of Extension of the GoSmart Mobile Agency Agreement dated December 29, 2015; and

iv.   GoSmart Mobile Agency Agreement, effective date February 1, 2013, as extended by the Notice of Extension of the GoSmart Mobile Agency Agreements dated December 29, 2015.

Certain of Debtor's obligations under the T-Mobile Dealer Agreement are secured by a first priority security interest in Debtor's assets as more particularly described in UCC Financing Statement number 065-2011-000982 filed on November 4, 2011 in the records of Grady County, Georgia and continued on June 3, 2016 pursuant to file number 065-2016-000408 and UCC Financings Statement number 065-2011-000983 filed on November 4, 2011 in the records of Grady County, Georgia and continued on August 24, 2016 pursuant to file number 065-2016-000589 as follows:

> (i) all of [Debtor's] right title and interest in its inventory and stock in trade in all its forms, wherever located, now or hereafter existing, including without limitation, wireless handsets, accessories, prepay products (including Equipment Kits, E-Coupon PINs and Prepay Cards), and all accessories to the foregoing, (ii) all of [Debtor's] equipment, supplies, fittings, machinery, furniture, fixtures other tangible personal property, wherever located, and other items of any kind obtained or possessed by [Debtor]; (iii) all of [Debtor's] right, title, and interest in the right to receive payment of money or other consideration relating to the sale of products or services of whatever nature and however evidenced (including but not limited to all accounts, contract rights, chattel paper, documents of title, letters of credit, certificates of deposit, securities, deposits, insurance policies, licenses, leases, contracts, judgments, chooses in action, copyrights, trademarks and guarantees); and (iv) all proceeds (including rents, royalties, and insurance proceeds) and products of any of Debtor's now owned or hereinafter acquired goods and other personal property described above.

 (the "T-Mobile Collateral").

The T-Mobile Collateral additionally includes certain collateral owned by T-Mobile pursuant to the consignment provisions of the T-Mobile Dealer Agreements.  The T-Mobile Collateral is additionally secured by Replacement Liens (as defined in the "Interim Order Granting Debtor's Motion Requesting Authorization to Use Cash Collateral" (Doc. No. 20) and "Final Order Granting Debtor's Motion Requesting Authorization to Use Cash Collateral" (Doc. No. 48)). Except as otherwise expressly mentioned herein, T-Mobile's first priority lien shall continue and attach to the same validity, priority and extent as existed on the Filing Date and all terms of the T-Mobile Dealer Agreements shall remain in full force and effect.  In the event of a store closing, upon request of T-Mobile, Debtor shall transfer the T-Mobile Collateral directly related to such store to T-Mobile free and clear of all interests.

As of the Petition Date, the Debtor was indebted to T-Mobile in the amount of $15,879.26 for inventory T-Mobile sold to the Debtor under the T-Mobile Dealer Agreements. T-Mobile satisfied that amount by recoupment after the Petition Date against commissions it owed to the

Debtor under the T-Mobile Dealer Agreements. To the best of Debtor's knowledge, Debtor has remained current on its post-Petition obligations to T-Mobile during the pendency of the Case and no other pre-Filing Date obligations have arisen.  Accordingly, Debtor is not aware of any arrearage or necessity to cure.  To the extent that T-Mobile or the Debtor become aware of any pre-Filing Date obligations or other obligations that have accrued or continue to accrue during the pendency of the Bankruptcy Case, such obligations will be paid in full in cash on the Effective Date of the Plan. On the Effective Date, Debtor intends on assuming the T-Mobile Dealer Agreements. Debtor acknowledges that T-Mobile's rights as to events of default shall be governed exclusively by the T-Mobile Dealer Agreement.  Pursuant to 11 U.S.C. §365(c)(1), such assumption requires T-Mobile's consent which the Debtor has yet to obtain. Debtor is aware that even with the consent of T-Mobile regarding the assumption of the T-Mobile Dealer Agreements, that the T-Mobile Dealer Agreements will expire without renewal, or may even be terminated early in accordance with their terms, as follows: (1) the ESDP Agreement will expire without renewal on November 1, 2017, (2) the EPP Agreement will expire without renewal on May 1, 2017, and (3) the GoSmart Exclusive Agreement and the GoSmart Agreement will each expire without renewal on January 31, 2018. Upon the non-renewal of the foregoing T-Mobile Dealer Agreements, the Debtor shall work with T-Mobile in accordance with its contractual obligations for the orderly and efficient disposition of the T-Mobile stores that Debtor operates directly or as a Master Dealer to various sub-dealers.

The holder of the Class 4 Secured Claim is impaired and entitled to vote to accept or reject the Plan.

### 6.5    Class 5:        Secured Claim of JP Morgan Chase Bank, N.A.

Class 5 shall consist of the Secured Claim of JP Morgan Chase Bank, N.A ("Chase").  On October 21 2016, Chase filed proof of claim number 17 in the amount of $887,787.50 (the "Asserted Chase Claim") itemized as (i) $500,000.00 principal for account ending in 4004 and (ii) $387,787.05 principal for account ending in 4016.  The Asserted Chase Claim is secured by Debtor's inventory, equipment, accounts, general intangibles, chattel paper, documents, instruments, and letter of credit rights as more particularly described in the Promissory Note dated February 15, 2013 (which includes a security agreement) and UCC Financing Statement numbers 00720122018830 and 00720122018831 filed on July 23, 2012 in the records of Bartow County, Georgia (collectively the "Chase Collateral").  Chase's security interest in the Chase Collateral is junior to T-Mobile's security interest pursuant to Class 4.   Debtor values the Chase Collateral at $200,975.79 (such amount plus interest accruing herein shall be referred to herein as the Class 5 Secured Claim").

Debtor shall pay the Class 5 Secured Claim in equal monthly payments of $3,190.00 each commencing on the Effective Date and continuing by the 28th day of each subsequent month until the Class 5 Secured Claim is paid in full with interest accruing at the annual rate of 4.5%. Any payments received by Chase on or after the Effective Date shall be referred to herein as the "Class 5 Secured Claim Payments."  The Class 5 Secured Claim Payments shall be applied first to accrued and unpaid interest which accrues on the Class 5 Secured Claim in accordance with the Plan and then to principal.  Chase shall retain its lien and security interest in the Chase Collateral to the same priority and validity as existed on the Filing Date and to the extent of the

Class 5 Secured Claim (i.e. $200,975.79); however, Chase shall release its lien on and security interest in the Chase Collateral for a payment of the then outstanding allowed Class 5 Secured Claim less any payment previously received and applied pursuant to this Plan. Upon request by Debtor, Chase shall promptly provide the then outstanding balance of the Class 5 Secured Claim and an accounting including all payments received and their application since the Filing Date.

The balance of Asserted Chase Claim in the amount of $686,811.71 (i.e. $887,787.50 – $200,975.79) shall be specifically classified and treated as a Class 11 General Unsecured Claim. Accordingly, Chase shall hold and be entitled to vote (i) its Class 5 Secured Claim in amount of $200,975.79 as a secured creditor in this Class 5; and (ii) as an unsecured creditor in the Class 11 General Unsecured Claim as to the deficiency balance of its Asserted Chase Claim in the amount of $686,811.71.

In the event Debtor defaults on payments pursuant to Class 5 of the Plan or otherwise defaults under Class 5 of the Plan, Chase shall send a Default Notice to Debtor in accordance with Article 2.3 of the Plan, which must contain the basis for declaring a default, and, in the event of a monetary default, the notice must state the amount necessary to cure the default and an address that will accept overnight deliveries.  If Debtor does not cure the default in the period provided in Article 2.3 of the Plan, Chase shall be authorized to accelerate the Class 5 Secured Claim and exercise its state law rights and remedies against the Chase Collateral.

Nothing herein shall constitute an admission as the nature, validity, or amount of claim. Debtor reserves the right to object to any and all claims for any reason.

The holder of the Class 5 Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**6.6    Class 6**:        **Secured Claim of MetroPCS Texas, LLC.**

Class 6 consists of the secured claim of MetroPCS Texas, LLC. ("MetroPCS TX") (the "Class 6 Secured Claim").  On October 12, 2016, MetroPCS TX filed Proof of Claim 13 which refers to certain dealer agreements (collectively the "MetroPCS TX Dealer Agreements")further described as follows:

i.    Exclusive Indirect Dealer Agreement (EPP to MetroPCS), effective date April 18, 2016 [Authorized Dealer Area: Dallas, TX];
ii.   Exclusive Indirect Dealer Agreement, effective date May 26, 2016 [Authorized Dealer Area: South Central Region]; and
iii.  Indirect Dealer Agreement (Non-Exclusive to MetroPCS), effective date May 20, 2016 [Authorized Dealer Area: South Central Region].

Certain of Debtor's obligations under the MetroPCS TX Dealer Agreement are secured by a security interest in Debtor's assets as more particularly described in the UCC Financing Statement 038-2016-010104 filed at 11:32:03 AM on July 18, 2016 in the records of Coweta County, Georgia as follows:

> [A] first position security interest in the following collateral: (i) all of Debtor's right, title and interest in its inventory and stock in trade in all of its forms, wherever located, now or hereafter existing, including without limitation, wireless handsets, accessories, prepay products (including ILD Cards, Prepay Cards, and any other similar cards), and all accessories to the foregoing; (ii) all of Debtor's equipment, supplies, fittings, machinery, furniture, fixtures, and other tangible personal property, wherever located, and other items of any kind obtained or possessed by Debtor; (iii) all of Debtor's right, title, and interest in the right to receive payment of money or other consideration relating to the sale of products or services, of whatever nature and however evidenced (including but not limited to all accounts, contract rights, chattel paper, documents of title, letters of credit, certificates of deposit, securities, deposits, insurance policies, licenses, leases, contracts, judgments, choses in action, copyrights, trademarks, and guarantees); and (iv) all proceeds (including rents, royalties, and insurance proceeds and products of any of Debtor's now owned or hereafter acquired goods and other personal property described above.

(the "MetroPCS TX Collateral")

The MetroPCS TX Collateral includes a first priority purchase money security interest as to inventory. MetroPCS TX may provide notification of such purchase money security interest in accordance with the Uniform Commercial Code, which will create a first-priority on inventory supplied on a go forward basis. The MetroPCS TX Collateral is additionally secured by Replacement Liens (as defined in the "Interim Order Granting Debtor's Motion Requesting Authorization to Use Cash Collateral" (Doc. No. 20) and "Final Order Granting Debtor's Motion Requesting Authorization to Use Cash Collateral" (Doc. No. 48)).

As of the Petition Date, the Debtor was indebted to MetroPCS GA in the amount of $5,024.29 (account no 1183) for inventory MetroPCS TX sold to the Debtor under the MetroPCS TX Dealer Agreements. MetroPCS TX satisfied that amount by recoupment after the Petition Date against commissions it owed to the Debtor under the MetroPCS TX Dealer Agreements. To the best of Debtor's knowledge, Debtor has remained current on its post-Petition obligations to MetroPCS TX during the pendency of the Case and no other pre-Filing Date obligations have arisen.  Accordingly, Debtor is not aware of any arrearage or necessity to cure.  To the extent that MetroPCS TX or the Debtor become aware of any pre-Filing Date obligations or other obligations that have accrued or continue to accrue during the pendency of the Bankruptcy Case, such obligations will be paid in full in cash on the Effective Date of the Plan.

On the Effective Date, Debtor intends on assuming the MetroPCS TX Dealer Agreements. Debtor acknowledges that MetroPCS TX's rights as to events of default shall be governed exclusively by the MetroPCS TX Dealer Agreement.  Pursuant to 11 U.S.C. §365(c)(1), such assumption requires MetroPCS TX's consent which the Debtor has yet to obtain. Moreover, to the extent that MetroPCS TX consents to the assumption of the MetroPCS TX Dealer Agreements, MetroPCS TX retains its unilateral right to terminate the MetroPCS TX Dealer Agreements on 120 day's written notice without cause. MetroPCS TX retains and preserves its rights to recoupment and set-off or to otherwise deduct any other claims from any amounts owing from MetroPCS TX to the Debtor.

Except as otherwise expressly mentioned herein, MetroPCS TX's lien shall continue and attach to the same validity, priority and extent as existed on the Filing Date and all terms of the MetroPCS TX Dealer Agreements shall remain in full force and effect.   In the event of a store closing, upon request of MetroPCS TX, Debtor shall transfer the MetroPCS TX Collateraldirectly related to the store to MetroPCS TX free and clear of all interests.

The holder of the Class 6 Secured Claim is impaired and entitled to vote to accept or reject the Plan.

**6.7    Class 7**:        **Secured Claim of MetroPCS Georgia, LLC.**

Class 7 consists of the secured claim of MetroPCS Georgia, LLC. ("MetroPCS GA") (the "Class 7 Secured Claim").  On October 12, 2016, MetroPCS GA filed Proof of Claim 12 which refers to certain dealer agreements (collectively the "MetroPCS GA Dealer Agreements") further described as follows:

  i.    Exclusive Indirect Dealer Agreement (EPP to MetroPCS), effective date April 18, 2016 [Authorized Dealer Area: Charlotte, NC]
 ii.    Exclusive Indirect Dealer Agreement, effective date May 2, 2016 [Authorized Dealer Area: Nashville, TN]; and
iii.    Exclusive Indirect Dealer Agreement (EPP to MetroPCS), effective date April 18, 2016 [Authorized Dealer Area: Atlanta, GA].

Certain of Debtor's obligations under the MetroPCS GA Dealer Agreement are secured by a security interest in Debtor's assets as more particularly described in the UCC Financing Statement 038-2016-010105 filed at 11:33:04 AM on July 18, 2016 in the records of Coweta County, Georgia as follows:

> [A] first position security interest in the following collateral: (i) all of Debtor's right, title and interest in its inventory and stock in trade in all of its forms, wherever located, now or hereafter existing, including without limitation, wireless handsets, accessories, prepay products (including ILD Cards, Prepay Cards, and any other similar cards), and all accessories to the foregoing; (ii) all of Debtor's equipment, supplies, fittings, machinery, furniture, fixtures, and other tangible personal property, wherever located, and other items of any kind obtained or possessed by Debtor; (iii) all of

Debtor's right, title, and interest in the right to receive payment of money or other consideration relating to the sale of products or services, of whatever nature and however evidenced (including but not limited to all accounts, contract rights, chattel paper, documents of title, letters of credit, certificates of deposit, securities, deposits, insurance policies, licenses, leases, contracts, judgments, choses in action, copyrights, trademarks, and guarantees); and (iv) all proceeds (including rents, royalties, and insurance proceeds and products of any of Debtor's now owned or hereafter acquired goods and other personal property described above.

(the "MetroPCS GA Collateral")

The MetroPCS GA Collateral includes a first priority purchase money security interest as to inventory. MetroPCS GA may provide notification of such purchase money security interest in accordance with the Uniform Commercial Code, which will create a first-priority on inventory supplied on a go forward basis. The MetroPCS GA Collateral is additionally secured by Replacement Liens (as defined in the "Interim Order Granting Debtor's Motion Requesting Authorization to Use Cash Collateral" (Doc. No. 20) and "Final Order Granting Debtor's Motion Requesting Authorization to Use Cash Collateral" (Doc. No. 48)).

As of the Petition Date, the Debtor was indebted to MetroPCS GA in the amount of $40,418.90 (i.e., $28,285.75 on account number 1174 and $12,133.15 on account number 1194) for inventory MetroPCS GA sold to the Debtor under the MetroPCS GA Dealer Agreements. MetroPCS GA satisfied that amount by recoupment after the Petition Date against commissions it owed to the Debtor under the MetroPCS GA Dealer Agreements. To the best of Debtor's knowledge, Debtor has remained current on its post-Petition obligations to MetroPCS GA during the pendency of the Case and no other pre-Filing Date obligations have arisen. Accordingly, Debtor is not aware of any arrearage or necessity to cure. To the extent that MetroPCS GA or the Debtor become aware of any pre-Filing Date obligations or other obligations that have accrued or continue to accrue during the pendency of the Bankruptcy Case, such obligations will be paid in full in cash on the Effective Date of the Plan.

On the Effective Date, Debtor intends on assuming the MetroPCS GA Dealer Agreements. Debtor acknowledges that MetroPCS GA's rights as to events of default shall be governed exclusively by the MetroPCS GA Dealer Agreement.   Pursuant to 11 U.S.C. §365(c)(1), such assumption requires MetroPCS GA's consent which the Debtor has yet to obtain. Moreover, to the extent that MetroPCS GA consents to the assumption of the MetroPCS GA Dealer Agreements, MetroPCS GA retains its unilateral right to terminate the MetroPCS GA Dealer Agreements on 120 day's written notice without cause. MetroPCS Ga retains and preserves its rights to recoupment and set-off or to otherwise deduct any other claims from any amounts owing from MetroPCS GA to the Debtor.

Except as otherwise expressly mentioned herein, MetroPCS GA's lien shall continue and attach to the same validity, priority and extent as existed on the Filing Date and all terms of the MetroPCS GA Dealer Agreements shall remain in full force and effect.  In the event of a store

closing, upon request of MetroPCS GA, Debtor shall transfer the MetroPCS GA Collateral directly related to such store to MetroPCS GA free and clear of all interests.

The holder of the Class 7 Secured Claim is impaired and is entitled to vote to accept or reject the Plan.

**6.8    Class 8:        Junior Priority Pre-Petition Asserted Secured Claims**

Class 8 consists of the asserted pre-petition secured claims which are junior to T-Mobile, the purchase money security interests of MetroPCS GA and MetroPCS TX, and Chase's pre-petition Secured Claim (the "Class 8 Secured Claims"). The known asserted Holders of Class 8 Secured Claims are as follows:

| Date Filed | Named Secured Party | Upon Information and Belief Holder of Asserted Obligation | Claim Amount |
|---|---|---|---|
| 12/16/2014 | NOWaccount Network Corporation | Small Business Credit Cooperative, Inc. | $278,574.93 |
| 5/22/2015 | Curve Commercial Services, Inc. | Curve Commercial Services, Inc. | $1,054,463.20 [2] |
| 5/27/2015 | Procurepal, LLC | Procurepal, LLC | $457,348.62 [3] |
| 9/17/2015 | Knight Capital Funding | Knight Capital Funding LLC | $0.00 [4] |
| 11/30/2015 | PowerUp Lending Group, LLC | PowerUp Lending Group, LLC | $78,088.33 |

Debtor's assets are fully secured and encumbered by the Class 4 Secured Claim of T-Mobile and the Class 5 Secured Claim of Chase, which are senior to any Class 8 Secured Claims. Accordingly, there are no assets to which Class 8 Secured Claims attach, and the allowed Secured Claim for any Holder of a Class 8 Secured Claim is $0.00.  The allowed amount of the Class 8 Secured Claims shall be $0.00 and the asserted security interest or any encumbrance of Debtor's assets shall continue and attach to the extent of $0.00.  The remaining claims of the Holders of Class 8 Secured Claims shall be specifically reclassified as and paid pursuant to Class 11 General Unsecured Claims.

On the Effective Date, the Holders of Class 8 Secured Claims shall terminate their UCC Financing Statement together with any and all other asserted liens or encumbrances against Debtor's assets.  The resulting deficiency for a Class 8 Secured Claim shall be and is classified as a General Unsecured Class 11 Claim. Debtor shall be authorized to file a termination of the

---

[2] Debtor scheduled Curve Commercial Services, Inc. ("Curve") as disputed and no proof of claim was filed by the Claims Bar Date. Accordingly, Curve's Class 11 General Unsecured Claim is $0.00.

[3] Debtor scheduled Procurepal, LLC ("Procurepal") as disputed and no proof of claim was filed by the Claims Bar Date. Accordingly, Procurepal's Class 11 General Unsecured Claim is $0.00.

[4] Debtor shows that any obligations to Knight Capital Funding LLC have been paid in full and satisfied; however, their UCC financing statements have not been terminated.

attendant UCC Financing Statement in the event any Holder of a Class 8 Secured Claim fails to cancel the same within ten (10) days of the Effective Date.

Nothing herein shall constitute an admission as to the nature, validity, or amount of claim. Debtor reserves the right to object to any and all claims.

The Holders of an Allowed Class 8 Secured Claim are not impaired and are not entitled to vote to accept or reject the Plan pursuant to Class 8, provided such creditors shall hold and be entitled to vote an unsecured claim in Class 11 General Unsecured Claim as to the deficiency balance resulting from their Class 8 Secured Claim and underlying indebtedness in the amount set forth in Class 11 to the extent said holder holds an Allowed General Unsecured Claim.

### 6.9    Class 9:    Secured Claim of World Omni Financial Corp.

Class 9 shall consist of the Secured Claim of World Omni Financial Corp. ("World Omni"). On November 19, 2016 World Omni filed proof of claim number 18 in the amount of $4,001.37 (such amount plus interest accruing at the annual rate of 4% is referred to herein as the Class 9 Secured Claim) secured by a 1st priority security interest in Debtor's 2012 Toyota Prius (the "Toyota").   Debtor shall pay the Class 9 Secured Claim in equal monthly payments of $126.95 each commencing on the Effective Date and continuing by the 28th day of each subsequent month until paid in full. World Omni's first priority security interest shall continue and attach to the Toyota to the same extent, validity and priority as existed on the Filing Date. Upon receipt of the then outstanding amount of the Class 9 Secured Claim, World Omni shall release its security interest in the Toyota.

Nothing herein shall constitute an admission as to the nature, validity, or amount of claim. Debtor reserves the right to object to any and all claims.

The Holder of the Class 9 Secured Claim is impaired and entitled to vote to accept or reject Debtor's Plan.

### 6.10    Class 10:    Secured Claim of BMW Bank of North America

Class 10 shall consist of the Secured Claim of BMW Bank of North America ("BMW"). On September 9, 2016, BMW filed proof of claim number 8 in the amount of $55,167.93 (such amount plus interest accruing at the annual rate of 4.5% is referred to herein as the "Class 10 Secured Claim") secured by a first priority security interest in Debtor's 2015 BMW X5 (the "BMW X5").   Debtor shall pay the Class 10 Secured Claim in equal monthly payments of $920.39 each commencing on the Effective Date and continuing by the 28th day of each subsequent month until paid in full. BMW's first priority security interest shall continue and attach to the BMW X5 to the same extent, validity and priority as existed on the Filing Date. Upon receipt of the then outstanding amount of the Class 10 Secured Claim, BMW shall release its security interest in the BMW X5.

Nothing herein shall constitute an admission as to the nature, validity, or amount of claim. Debtor reserves the right to object to any and all claims.

The Holder of the Class 10 Secured Claim is impaired and entitled to vote to accept or reject Debtor's Plan.

### 6.11    General Unsecured Claims

Class 11 shall consist of General Unsecured Claims. Holders of General Unsecured Claims shall share pro-rata quarterly distributions of $27,000.00 each commencing on the 28th day of the final month of the first quarter following the Effective Date occurs and continuing on 28th day of the final month of each subsequent quarter (i.e. June, Sept, December, and March) for a total of 12 quarterly payments. Debtor anticipates and projects but does not warrant the following Holders of Class 11 Claims and the following distributions:

| Anticipated Holders | Scheduled | POC Number | POC Amount | Est. Claim | Quarterly Distribution | Total Distribution |
|---|---|---|---|---|---|---|
| ADLI Law Group, PC | $7,267.87 | 6 | $7,763.20 | $7,763.20 | $28.44 | $341.27 |
| American Express Bank, FSB | $207,645.50 | 10 | $207,642.67 | $207,642.67 | $760.65 | $9,127.85 |
| Bright Point North America, LP | $7,750.00 | NA | | $7,750.00 | $28.39 | $340.69 |
| Bright Point North America, LP | $28,218.42 | NA | | $28,218.42 | $103.37 | $1,240.47 |
| Briskin, Cross & Sanford, LLC | $3,249.26 | NA | | $3,249.26 | $11.90 | $142.84 |
| Curve Commercial Services, LLC (Deficiency from Class 8) | $1,054,463.20 | NA | | $0.00[5] | $0.00 | $0.00 |
| David Kirkup / B2B CFO | $15,815.00 | 2 | $25,000.00 | $25,000.00 | $91.58 | $1,098.99 |
| Docusign | $3,800.00 | NA | | $3,800.00 | $13.92 | $167.05 |

---

[5] Debtor scheduled Curve Commercial Services, LLC ("Curve") as disputed and Curve did not file a proof of claim. The Bar Date passed on October 17, 2016.  Accordingly, any claim asserted or assertable by Curve shall be disallowed in its entirety and forever discharged.

| Anticipated Holders | Scheduled | POC Number | POC Amount | Est. Claim | Quarterly Distribution | Total Distribution |
|---|---|---|---|---|---|---|
| Empire Global Advisory Service | $83,405.36 | NA | | $83,405.36 | $305.54 | $3,666.45 |
| Flex Hardy, LLC | $59,072.00 | NA | | $59,072.00 | $216.40 | $2,596.77 |
| Galaxy Wireless | $95,032.72 | 9 | $95,032.72 | $95,032.72[6] | $348.13 | $4,177.58 |
| Ingram Micro Mobility | NA | 7 | $28,218.42 | $28,218.42 | $103.37 | $1,240.47 |
| iTalk, Inc. | $249,313.75 | NA | | $249,313.75 | $913.31 | $10,959.69 |
| JPMorgan Chase Bank, NA | $115,813.52 | NA | | $115,813.52 | $424.26 | $5,091.09 |
| JPMorgan Chase Bank, NA (Deficiency from Class 5) | $895,127.24 | 17 | $887,787.05 | $686,811.06[7] | $2,515.98 | $30,191.81 |
| Justin Num | $240,000.00 | NA | | $240,000.00 | $879.19 | $10,550.26 |
| Kil Won Lee | $171,172.39 | NA | | $171,172.39 | $627.05 | $7,524.64 |
| Knight Capital Funding | $0.00 | NA | | $0.00[8] | $0.00 | $0.00 |
| Mazal Group | $42,400.00 | NA | | $42,400.00 | $155.32 | $1,863.88 |
| McMillian & Associates | $15,902.65 | 3 | $16,141.22 | $16,141.22 | $59.13 | $709.56 |
| Moin Telecom, LLC | $231,662.27 | NA | | $231,662.27[9] | $848.64 | $10,183.74 |
| Polsinali | $3,752.50 | NA | | $3,752.50 | $13.75 | $164.96 |
| Power Up Lending Group, Ltd. | $70,178.57 | NA | | $70,178.57 | $257.08 | $3,085.01 |

---

[6] Scheduled as disputed.

[7] Scheduled as two claims: (i) $500,000.00 and (ii) $390,127.24. However, J.P. Morgan Chase filed one proof of claim encompassing both amounts. See POC 17.

[8] Debtor shows that any obligations to Knight Capital Funding, LLC have been paid in full and satisfied; however, their UCC financing statements have not been determined.

[9] Scheduled as disputed. The claim of Moin Telecom is the subject of a Court approved settlement agreement with the claim being satisfied by an outside third party. To the extent that the claim is satisfied, Moin will not receive a distribution on its Class 11 Claim.

| Anticipated Holders | Scheduled | POC Number | POC Amount | Est. Claim | Quarterly Distribution | Total Distribution |
|---|---|---|---|---|---|---|
| Power Up Lending Group, Ltd. | $96,977.13 | NA | | $96,977.13 | $355.25 | $4,263.06 |
| Procurepal, LLC (Deficiency from Class 8) | $457,348.62 | NA | | $0.00[10] | $0.00 | $0.00 |
| Sky Phone, LLC | $79,448.00 | NA | | $79,448.00 | $291.04 | $3,492.49 |
| Small Business Credit Cooperative, Inc. (Deficiency from Class 8) | $221,321.18 | 15 | $278,574.93 | $278,574.93[11] | $1,020.50 | $12,245.99 |
| Tech Data Corporation | NA | 4 | $1,072,088.18 | $0.00 | $0.00 | $0.00 |
| Tech Data Corporation | $821,051.32 | 1 | $821,051.32 | $821,051.32 | $3,007.74 | $36,092.94 |
| Total Mobile | $40,898.00 | NA | | $40,898.00 | $149.82 | $1,797.85 |
| URSA Information Systems, Inc. | $115,626.36 | 14 | $144,471.34 | $144,471.34 | $529.24 | $6,350.88 |
| Weldin Law Offices, P.C. | $12,840.96 | 11 | $13,643.52 | $13,643.52 | $49.98 | $599.76 |
| **Total** | | | | **$3,609,860.56** | **$14,109.00** | **$169,308.00** |

The Claims of the Class 11 Creditors are Impaired by the Plan and the holders of Class 11 Claims are entitled to vote to accept or reject the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of the Class 11 Claim. Debtor reserves the right to object to any and all claims.

### 6.12    Class 12:        Interest Claims

Class 12 consists of Interest Claims. Upon entry of the Confirmation Order, prepetition shares will be canceled. New stock in the Reorganized Debtor shall be issued ("PostPetition

---

[10] Debtor scheduled Procurepal, LLC ("Procurepal") as disputed and Procurepal did not file a proof of claim.  The Bar Date passed on October 17, 2016.  Accordingly, any claim asserted or assertable by Procurepal shall be disallowed in its entirety and forever discharged.

[11] Scheduled as disputed.

Shares") to KHC, LLC, a Georgia Limited Liability Company ("KHC") in exchange for a cash infusion in the amount of $500,000.00 which such funds shall be used to pay administrative expense claims and otherwise fund the operations and plan obligations of the Debtor. Kil Won Lee, the president of the Debtor, is the sole shareholder of KHC. If Class 11 does not vote to accept the Plan as a Class, then the following additional terms shall apply: KHC shall purchase 100% of the equity interest of the reorganized debtor. Such purchase may be subject to competing bids in the market place under certain circumstances. Specifically if Class 11 of unsecured claims do not vote to accept the Plan as a class as set forth in this provision, then, in that event third parties may be able to purchase the equity interest in the Reorganized Debtor complying with the Bid Procedures attached to the Disclosure Statement as "Exhibit D" and the Plan as Exhibit "B" or as otherwise ordered by the Court.  The requirement for, sufficiency and validity of any such bid shall be subject to the approval and review of the Court at the Confirmation Hearing.

The holders of Class 12 Claims are deemed to accept the Plan.

## VII.   Administrative Expenses

Treatment of administrative expense claims is set forth in Article 5 of the Plan and summarized below.

7.1    Summary.    Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims against Debtor are not classified for purposes of voting on, or receiving Distributions under the Plan.  Holders of such Claims are not entitled to vote on the Plan.  All such Claims are instead treated separately in accordance with Article 5 of the Plan and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

With respect to potential Administrative Expense Claims, Debtor, pursuant to Court order, retained the law firm of Jones & Walden, LLC ("Firm") to serve as bankruptcy counsel. As set forth in the employment application and supporting documents, the Firm received a prepetition retainer in the amount of $35,000.00.  As of the date hereof, the fees and expenses incurred by the Firm have exceeded the retainer.  Debtor shall pay any unpaid allowed Administrative Expense Claim held by the Firm on the Effective Date unless otherwise agreed to by the Firm.  Debtor is paying post-petition bills and does not expect any claims for unpaid post-petition goods and services other than possible professional fees.  Debtor will incur quarterly trustee fees which Debtor intends to pay when due.

7.2    Administrative Expense Claims.

7.2.1   Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash on the latest of (1) the Effective Date, (ii) as soon as practicable after the date on which such Claim becomes an Allowed Administrative Expense Claim, (iii) upon such other terms as may be agreed upon by such holder and Debtor, or (iv) as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims representing obligations incurred by

Debtor in the ordinary course of business, or otherwise assumed by Debtor on the Effective Date pursuant to this Plan, including any tax obligations arising after the Effective Date, will be paid or performed by Debtor when due in accordance with the terms and conditions of the particular agreements or non-bankruptcy law governing such obligations.

      7.2.2  Except as otherwise provided in this Plan, any Person holding an Administrative Expense Claim, other than an Administrative Expense Claim arising from the operation by Debtor of its business in the ordinary course of business, shall file a proof of such Administrative Expense Claim with the Bankruptcy Court on or before the Effective Date.  At the same time any Person files an Administrative Expense Claim, such Person shall also serve a copy of the Administrative Expense Claim upon counsel for Debtor.  Any Person who fails to timely file and serve a proof of such Administrative Expense Claim shall be forever barred from seeking payment of such Administrative Expense Claims by Debtor or the Estate.

      7.2.3  Any Person seeking an award by the Bankruptcy Court of Professional Compensation shall file a final application with the Bankruptcy Court for allowance of Professional Compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days after the Effective Date or by such other deadline as may be fixed by the Bankruptcy Court.

The Plan provides that Debtor may pay professional fees incurred after confirmation of the Plan without Court approval.  Debtor shall pay all pre-confirmation fees of professionals as payment of same is approved by the Court unless otherwise agreed by such professionals.

## VIII.  Tax Consequences

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and holders of Interests, or within each Class.  Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes.  Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only.  No specific tax consequences to any Creditor or holder of an Interest are represented, implied, or warranted.  Each holder of a Claim or Interest should seek professional tax advice.

**The proponent assumes no responsibility for the tax effect that consummation of the Plan will have on any given Holder of a Claim or Interest.  Holders of Claims or Interest are strongly urged to consult their own tax advisors covering the federal, state, local and foreign tax consequences of the Plan to their individual situation.**

## IX.  Liquidation Analysis

Debtor sets forth the following liquidation test:

The Debtor's assets are fully secured by the claims of T-Mobile and JP Morgan Chase and would fail to generate any funds for junior priority creditors in liquidation.  In the event Debtor's estate is liquidated, the unsecured creditors would not receive any return. Conversion and liquidation under Chapter 7 of the Bankruptcy Code would result in the appointment of a Chapter 7 trustee and the liquidation of assets.  Assets disposed of by "liquidation" or "fire" sale generally generate significantly less proceeds than assets that are marketed and sold as a going concern. Moreover, a Chapter 7 trustee would incur trustee's fees pursuant to 11 U.S.C. §326(a) of the Bankruptcy Code[12] as well as other costs associated with liquidation such as broker fees and attorney fees.

Under the Plan, general unsecured creditors will receive a pro-rata share of $169,308.00. However, in liquidation, the assets would fail to generate any return to unsecured creditors. Thus creditors will receive a higher distribution under the Plan (i.e. $169,308.00) then they would in the event of a liquidation (i.e. $0).

## X.      Procedures for Treating and Resolving Disputed Claims

### A.      Objection to Claims

The Plan provides that Debtor shall be entitled to object to Claims, provided, however, that Debtor shall not be entitled to object to Claims (i) that have been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date or (ii) that are Allowed by the express terms of the Plan.

### B.      No Distributions Pending Allowance

Except as otherwise provided in the Plan, no Distributions will be made with respect to any portion of a Claim unless and until (i) Debtor has determined no objection to such Claim will be filed, or (ii) any pending objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

### C.      Estimation of Claims

Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to the Bankruptcy Code regardless of whether Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such

---

[12] 11 USC §326(a) states that a Chapter 7 trustee would incur trustee's fees equal to 25% of the first $5,000.00 of Liquidation Value of Assets; 10% of amount in excess of $5,000.00 but not in excess of $50,000.00 of Liquidation Value of Assets; 5% of any amount in excess of $50,000.00 but not in excess of $1,000,000.00; 3% of any amount in excess of $1,000,000.00 of the Liquidation Value of Asset, and commissions for auctioneers for personal property generally is equivalent to ten (10%) percent of the gross sales price and commissions for real property brokers is generally six percent (6%) of the gross sales price.  In addition, the attorney for the Chapter 7 trustee would incur attorney's fees as would the current Chapter 11 attorneys.  Liquidation Value of personal property, tools and equipment, inventory and accounts receivable assumed at 60% of scheduled fair market value.

objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

### D.      Resolution of Claims Objections

On and after the Effective Date, Debtor shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims without approval of the Bankruptcy Court.

### XI.    Conditions Precedent to the Effective Date

### A.      Conditions to Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 11 of the Plan.

(a)      The Confirmation Order shall not have been vacated, reversed or modified and, as of the Effective Date, shall not be stayed.

(b)      All documents and agreements to be executed on the Effective Date or otherwise necessary to implement the Plan shall be in form and substance that is acceptable to Debtor, in its reasonable discretion.

(c)      Debtor shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement this Plan and that is required by law, regulation, or order.

Under the Plan, each of the conditions set forth above may be waived, in whole or in part, by Debtor without any notice to any other parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the the Effective Date may be asserted by Debtor in its sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by Debtor in its sole discretion).  The failure of Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## XII.    Certain Effects of Confirmation

### A.    Vesting of Debtor's Assets

Except as otherwise explicitly provided in the Plan, upon the Court's entry of the Confirmation Order, all property comprising the Estate (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in Debtor free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders, except as specifically provided in the Plan.  As of the earlier of the Effective Date and the entry of a Final Decree, Debtor may operate its business and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.

### B.    Discharge of Debtor

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, the Distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in Debtor or its Estate that arose prior to the Effective Date regardless of whether a claimant accepted or rejected the Plan. Notwithstanding the foregoing, to the extent the T-Mobile Dealer Agreements, the MetroPCS GA, and the MetroPCS TX Dealer Agreements are assumed, T-Mobile, MetroPCS GA, and MetroPCS TX will not be subject to the discharge provisions of the Plan.  In no event will discharge affect T-Mobile's, MetroPCS GA's, and MetroPCS TX's liens or rights of setoff and recoupment.

### C.    Setoffs

Debtor may, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that Debtor may have now or in the future against such Holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtor of any such claim that Debtor may have against such Holder.

### D.    Releases of Claims by Holders of Claims

**Except as otherwise specifically provided for in the Plan, upon the entry of a Confirmation Order (a) each Person that votes to accept the Plan or is presumed to have voted for the Plan pursuant to Section 1126(f) of the Bankruptcy Code; and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Entity or Person, that has held, holds, or may hold a Claim or interest (each, a "Release Obligor"), in consideration for the obligations of Debtor under the Plan and the case, shall have conclusively, absolutely, unconditionally,**

**irrevocably and forever, released Debtor from any (i) Claim or (ii) causes of action existing as of the Effective Date (whether arising from, based on or relating to, in whole or in part, the subject matter of, or the transaction or event giving rise to the Claim or claim for relief of such Release Obligor), and (iii) any act, omission, occurrence or event in any manner related to such subject matter, transaction or obligation.**

### E.    Injunction

Upon entry of a Confirmation Order in this case, except as provided for in this Plan, the Confirmation Order shall act as a permanent injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim or Cause of Action except as provided for under the Plan against: (1) Debtor, or (2) against any property of Debtor. Such injunction shall survive the closure of the Bankruptcy Case and this Court shall retain jurisdiction to enforce such injunction. Notwithstanding the foregoing, to the extent the T-Mobile Dealer Agreements, the MetroPCS GA, and the MetroPCS TX Dealer Agreements are assumed, T-Mobile, MetroPCS GA, and MetroPCS TX will not be subject to the permanent injunction.  In no event will the permanent injunction affect T-Mobile's, MetroPCS GA's, and MetroPCS TX's liens or rights of setoff and recoupment.

### F.    Miscellaneous Plan Provisions

#### 1.    Modification of Plan

Debtor shall be allowed to modify the Plan pursuant to section 1127 of the Bankruptcy Code to the extent applicable law permits.  Subject to the limitations contained in the Plan, pursuant to Article 13.1 of the Plan, Debtor may modify the Plan, before or after confirmation, without notice or hearing, or after such notice and hearing as the Bankruptcy Court deems appropriate, if the Bankruptcy Court finds that the Modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto.  In the event of any modification on or before confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the Bankruptcy Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes.  Debtor reserves the right in accordance with section 1127 of the Bankruptcy Code to modify the Plan at any time before the Confirmation Date.

#### 2.    Retention of Jurisdiction

The Plan provides that subsequent to the Effective Date, the Bankruptcy Court shall have or retain jurisdiction for the following purposes:

(a)    To adjudicate objections concerning the allowance, priority or classification of Claims and any subordination thereof, and to establish a date or dates by which objections to Claims must be filed to the extent not established in the Plan;

(b)   To liquidate the amount of any disputed, contingent or unliquidated Claim, to estimate the amount of any disputed, contingent or unliquidated claim, to establish the amount of any reserve required to be withheld from any distribution under the Plan on account of any disputed, contingent or unliquidated claim;

(c)   To resolve all matters related to the rejection, assumption and/or assignment of any Executory Contract or Unexpired Lease of Debtor;

(d)   To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by Debtor;

(e)   To hear and rule upon all applications for Professional Compensation;

(f)   To remedy any defect or omission or reconcile any inconsistency in the Plan, as may be necessary to carry out the intent and purpose of the Plan;

(g)   To construe or interpret any provisions in the Plan and to issue such orders as may be necessary for the implementation, execution and consummation of the Plan, to the extent authorized by the Bankruptcy Code;

(h)   To adjudicate controversies arising out of the administration of the Estate or the implementation of the Plan;

(i)   To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of the Plan, including the Distribution of funds from the Estate and the payment of claims;

(j)   To determine any suit or proceeding brought by Debtor to recover property under any provisions of the Bankruptcy Code;

(k)   To hear and determine any tax disputes concerning Debtor and to determine and declare any tax effects under the Plan;

(l)   To determine such other matters as may be provided for in the Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

(m)   To determine any controversies, actions or disputes that may arise under the provisions of the Plan, or the rights, duties or obligations of any Person under the provisions of the Plan;

(n)   To adjudicate any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of, or in connection with, any agreement pursuant to which Debtor sold any of its assets during the Bankruptcy Cases;

(o)   To enter a final decree; and

(p)    To enforce and interpret any order or injunctions entered in this Bankruptcy Case.

### 3.    Distributions

(a)    <u>Disbursing Agent</u>.  Unless otherwise provided for herein, all Distributions under this Plan shall be made by Debtor or its agent.

(b)    <u>Distributions of Cash</u>.  Any Distribution of Cash made by Debtor pursuant to this Plan shall, at Debtor's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank or in any other form of cash or cash equivalent.

(c)    <u>No Interest on Claims or Interests</u>.  Unless otherwise specifically provided for in this Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor and a Holder, postpetition interest shall not accrue or be paid on Claims, and no Holder shall be entitled to interest accruing on or after the Filing Date on any Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final determination is made when and if such Disputed Claim becomes an Allowed Claim.

(d)    <u>Delivery of Distributions</u>.  The Distribution to a Holder of an Allowed Claim shall be made by Debtor (a) at the address set forth on the proof of claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to Debtor after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and Debtor has not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records.

(e)    If any Distribution on an Unsecured Claim ("Unsecured Distribution") is tendered by Debtor to a Holder of an Unsecured Claim and returned as undeliverable, refused or otherwise returned ("Unsecured Distribution Refusal"), Debtor shall not be responsible for making any further Unsecured Distribution on account of such Unsecured Claim.  Accordingly, in the event of an Unsecured Distribution Refusal, Debtor shall be relieved of any obligation to make said payment or Distribution and Debtor is relieved of any obligation to make further payments or Distributions on such Unsecured Claim under the Plan.

If any Distribution on a Secured Claim or Priority Claim ("Secured or Priority Distribution") is tendered by Debtor to a Holder of a Secured Claim or Priority Claim and returned as undeliverable, refused or otherwise returned ("Secured or Priority Distribution Refusal"), the Holder of such Secured Claim or Priority Claim, as applicable, shall be deemed to have waived its right to such tendered payment or Distribution and such tendered payment or Distribution shall be

deemed satisfied.  In the event of a Secured or Priority Distribution Refusal, any obligation of Debtor to make any additional or further payment on such Secured Claim or Priority Claim shall be tolled until such time as: (i) notice is provided to Debtor that the Holder of such Secured Claim or Priority Claim seeks to receive payments from Debtor on the Secured Claim or Priority Claim or otherwise seeks to enforce Debtor's obligations under the Plan or otherwise enforce the Secured Claim or Priority Claim and (ii) any dispute regarding the Secured or Priority Distribution Refusal and its implications is resolved by agreement of the parties or the Bankruptcy Court (the "Tolling Period").  Only in the event of such notice to Debtor shall Debtor's obligations to perform as to the applicable Secured Claim or Priority Claim resume.  The Tolling Period shall: (i) extend the term of the payments on such Secured Claim or Priority Claim and (ii) bar any interest from accruing on the Secured Claim or Priority Claim until such time as any dispute regarding the Secured or Priority Distribution Refusal shall be resolved by Final Order.  Notwithstanding anything in the Plan, or any loan document, agreement or otherwise to the contrary, no provision allowing the imposition of late fees, default interest, late charges, damages, or costs and fees against the Debtor or the Debtor's property shall be applicable during the Tolling Period or any period during which a dispute regarding a Tolling Period is being resolved.  For purposes of clarification, Debtor shall not be required to make any lump sum cure of payments or Distributions which would have otherwise come due during (i) the Tolling Period or (ii) any period during which a dispute regarding a Tolling Period is unresolved, and Debtor shall recommence Distributions upon the resolution of such dispute on the terms in the Plan as tolled.

(f)     <u>Distributions to Holders as of the Record Date</u>.  All Distributions on Allowed Claims shall be made to the Record Holders of such Claims.  As of the close of business on the Confirmation Date, the Claims register maintained by the Bankruptcy Court shall be closed, and there shall be no further change in the Holder of any Claim.  Debtor shall have no obligation to recognize any transfer of any Claim occurring after the Confirmation Date.  Debtor shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Confirmation Date.

(g)     <u>Fractional Dollars</u>.  Any other provision of this Plan notwithstanding, the Debtor shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, at Debtor's option the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

(h)     <u>Withholding Taxes</u>.  Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements.

## XIII.    Confirmation and Consummation Procedure

### A.    General Information

All creditors whose Claims are Impaired by the Plan may cast their votes for or against the Plan.  As a condition to confirmation of the Plan, the Bankruptcy Code requires that one Class of Impaired Claims votes to accept the Plan.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of Impaired Claims as acceptance by holders of at least two-thirds of the dollar amount of the class and by more than one-half in number of Claims. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan. Voting is accomplished by completing, dating, signing and returning the ballot form (the "Ballot") by the Voting Deadline.  Ballots will be distributed to all creditors entitled to vote on the Plan and is part of the Solicitation Package accompanying the Disclosure Statement.  The Ballot indicates (i) where the Ballot is to be filed and (ii) the deadline by which creditors must return their Ballots.

Unless otherwise specifically provided in a class of the Plan, in the event of a default by Debtor in payments under the Plan or otherwise, the Holder of such Claim must send written notice to Debtor and Cameron McCord of the claimed default.

Events of Default.    As provided in Article 2.3 of the Plan, unless otherwise specifically provided in a class under the Plan, in the event of a default by Debtor in payments under the Plan or otherwise, the Holder must send written notice ("Default Notice") to Debtor at the addresses of record for Debtor as reflected on the docket for this Bankruptcy Case, unless Debtor has provided the Holder with a written notice of a change of address.  Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default, as well as notice that Debtor has fifteen (15) days (in the case of a monetary default) and thirty (30) days (in the case of a non-monetary default) from receipt by Debtor and Debtor's counsel of the Default Notice (or the following business day if the 15th or 30th day does not fall on a business day) to cure such default (and the address for payment, which will accept overnight deliveries, in the event of a monetary default). The Holder must send such Default Notice to Debtor via certified mail or recognized overnight carrier with a copy via email or fax and certified mail to Cameron M. McCord (Jones & Walden, LLC) at the address reflected in the then current directory of the State of Bar of Georgia.  Debtor shall have fifteen (15) days or thirty (30) days (as applicable) from Debtor's and Debtor's counsel's receipt of the Default Notice to cure such default.  Receipt by Debtor's Attorney shall not be deemed receipt by Debtor of the required Default Notice. Notwithstanding anything to the contrary in the Plan or otherwise, a default under one Class of Claims or to a creditor shall not constitute a default under any other Class of Claims or any other creditor. (For example a default under Class 1 shall not constitute a default under Class 3).

Notice.        All notices under the Plan shall be in writing.  Unless otherwise specifically provided herein, all notices shall be sent to Debtor via U.S. Certified Mail Return Receipt or by recognized overnight carrier to the address of record for Debtor in this Case, unless Debtor has provided such Holder with written notice of change of address for Debtor, with a copy via email or fax and certified mail to Cameron M. McCord at the address reflected in the

then current directory of the State Bar of Georgia.  Receipt of notice by Cameron M. McCord (Jones & Walden, LLC) shall not be deemed receipt by Debtor of the required notice. Notice to creditors may be provided (a) at the address set forth on the proof of claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to Debtor after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and Debtor has not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records.

### B.    Solicitation of Acceptances

This Disclosure Statement has been approved by the Court as containing "adequate information" to permit creditors and equity interest holders to make an informed decision whether to accept or reject the Plan.

### C.    Acceptances Necessary to Confirm the Plan

At the Confirmation Hearing, the Court shall determine, among other things, whether the Plan has been accepted by Debtor's creditors.  Impaired classes will be deemed to accept the Plan if at least two-thirds in amount and more than one-half in number of the Claims in each class vote to accept the Plan.  Furthermore, in such event, unless there is unanimous acceptance of the Plan by the impaired classes, the Court must also determine that any non-accepting Class members will receive property with a value, as of the Effective Date of the Plan, that is not less than the amount that such Class member would receive or retain if Debtor were liquidated as of the Effective Date of the Plan under Chapter 7 of the Bankruptcy Code.

### D.    Confirmation of Plan Pursuant to Section 1129(b)

The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all Impaired classes.  To confirm the Plan without the requisite number of acceptances of each Impaired Class, the Court must find that at least one Impaired Class has accepted the Plan without regard to the acceptances of insiders, and the Plan does not discriminate unfairly against, and is otherwise fair and equitable, to any Impaired Class that does not accept the Plan. Accordingly, if any Impaired Class does not vote to accept the Plan, Debtor will seek to confirm the Plan under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

### E.    Considerations Relevant to Acceptance of the Plan

Debtor's recommendation that all Creditors should vote to accept the Plan is premised upon Debtor's view that the Plan is preferable to other alternatives for liquidation of Debtor's estate.  It appears unlikely to Debtor that an alternate plan of reorganization or liquidation can be proposed that would provide for payments in an amount equal or greater than the amounts proposed under the Plan.  If the Plan is not accepted, it is likely that the interests of all creditors will be further diminished.

**Disclaimer**

*This Disclosure Statement contains summaries of certain provisions of the Plan, statutory provisions, documents related to the Plan, events in Debtor's Chapter 11 case, and financial information. Although Debtor believes that the Plan and related document summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents or statutory provisions. Factual information contained in this Disclosure Statement has been provided by Debtor's management, except where otherwise specifically noted. Debtor is unable to warrant or represent that the information contained herein, including the financial information, is without any inaccuracy or omission. The financial data set forth herein, except as otherwise specifically noted, has not been subjected to an independent audit.*

*Nothing contained herein shall (1) constitute an admission of any fact or liability by any party, (2) be admissible in any nonbankruptcy proceeding involving Debtor or any other party; provided, however, that in the event Debtor defaults under the Plan, the Disclosure Statement may be admissible in a proceeding relating to such default for the purpose of establishing the existence of such default, or (3) be deemed conclusive advice on the tax or other legal effects of Debtor's Plan as to holders of Claims or Interests. You should consult your personal counsel or tax advisor on any questions or concerns regarding tax or other legal consequences of the Plan.*

*Except for historical information, all the statements, expectations, and assumptions, including expectations and assumptions contained in this Disclosure Statement, involve a number of risks and uncertainties. Although Debtor has used its best efforts to be accurate in making these statements, it is possible that the assumptions made by Debtor may not materialize. In addition, other important factors could affect the prospect of recovery to Creditors including, but not limited to, the inherent risks of litigation and the amount of Allowed Claims.*

*All Creditors and Interest Holders are advised and encouraged to read this Disclosure Statement and the Plan in their entirety. Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, any exhibits, and the Disclosure Statement as a whole.*

*This Disclosure Statement has been prepared in accordance with § 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure and not in accordance with federal or state securities laws. This Disclosure Statement has neither been approved nor disapproved by the Securities and Exchange Commission ("SEC"), nor has the SEC passed on the accuracy or adequacy of the statements contained herein. This Disclosure Statement was prepared to provide holders of Claims and Interests in Debtor with "adequate information" (as defined in the Bankruptcy Code) so that they can make an informed judgment about the Plan.*

*As to contested matters, adversary proceedings, and other actions or threatened actions, this Disclosure Statement shall not constitute nor be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.*

*The information contained in this Disclosure Statement is included herein for the purpose of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to, and how to vote on, the Plan.*

**The representations in this Disclosure Statement are those of Debtor. No representations concerning Debtor are authorized other than as set forth in this statement. Any representation or inducement made to secure acceptance of this Plan which are other than as contained in this document should not be relied upon by any Person. The information contained herein has not been subject to a certified audit. Every effort, however, has been made to provide adequate financial information in this Disclosure Statement. The representations by Debtor are not warranted or represent to be without any inaccuracy, although every effort has been made to be accurate. Neither the Plan nor this Disclosure Statement has been designed to forecast consequences which follow from a general rejection of this Plan, although an attempt is made to state the consequences of a liquidation of Debtor.**

Respectfully submitted this 16th day of May, 2017.

**United Mobile Solutions, LLC**

/s/ *Kil Won Lee*
Kil Won Lee, President

**JONES & WALDEN, LLC**

/s/ Cameron M. McCord
Cameron M. McCord
Georgia Bar No. 143065
Leon S. Jones
Georgia Bar No. 003980
21 Eighth Street, NE
Atlanta, Georgia 30309
(404) 564-9300
**Attorneys for Debtor in Possession**

**Exhibit "A" to Disclosure Statement**

**United Mobile Solutions, LLC**
2 yr Cash Basis PnL Projections

| | 100% | 125% | 115% | 95% | 90% | 85% | 85% | 100% | 100% | 90% | 120% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **January Actual** | **17-Feb** | **17-Mar** | **17-Apr** | **17-May** | **17-Jun** | **17-Jul** | **17-Aug** | **17-Sep** | **17-Oct** | **17-Nov** |
| **Income and Deposits** | | | | | | | | | | | |
| **MTPCS Sub Dealer Rev.** | | | | | | | | | | | |
| SalesRevenueSubDealer | $ 86,071 | $ 187,931 | $ 239,396 | $ 307,629 | $ 395,523 | $ 471,852 | $ 570,155 | $ 728,595 | $ 786,420 | $ 728,595 | 999,216 |
| **MTPCS Direct Retail Rev.** | | | | | | | | | | | |
| RetailSalesRevenue | $ 100,187 | $ 234,080 | $ 215,354 | $ 177,901 | $ 168,538 | $ 159,174 | $ 159,174 | $ 187,264 | $ 187,264 | $ 168,538 | 224,717 |
| MetroCallidusCommissionSpiff | $ 195,190 | $ 65,648 | $ 60,396 | $ 49,892 | $ 47,267 | $ 44,641 | $ 44,641 | $ 52,518 | $ 52,518 | $ 47,267 | 63,022 |
| AccessoryRevenue | $ | $ 17,600 | $ 16,192 | $ 13,376 | $ 12,672 | $ 11,968 | $ 11,968 | $ 14,080 | $ 14,080 | $ 12,672 | 16,896 |
| QpayPaymentRevenue | $ 201,711 | $ 268,090 | $ 246,643 | $ 203,748 | $ 193,025 | $ 182,301 | $ 182,301 | $ 214,472 | $ 214,472 | $ 193,025 | 257,366 |
| **T-MOBILE MAGENTA REVENUE** | | | | | | | | | | | |
| T-MOBILE COMMISSIONS REVENUE | $ 271,109 | $ 315,000 | $ 324,999 | $ 325,000 | $ 325,000 | $ 335,000 | $ 335,000 | $ 335,000 | $ 335,000 | $ 335,000 | 335,000 |
| EPAY REVENUE | $ 3,651 | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | 8,500 |
| Total | $ 857,980 | $ 1,096,849 | $ 1,111,479 | $ 1,086,047 | $ 1,150,524 | $ 1,213,436 | $ 1,311,739 | $ 1,540,429 | $ 1,598,254 | $ 1,493,596 | 1,904,717 |
| | | | | | | | | | | | |
| **Inventory Purchases and Carrier COG** | $ - | | | | | | | | | | |
| **MTPCS Sub Dealer COGS** | | | | | | | | | | | |
| SubDealerCostOfSales | $ 322,084 | $ 168,188 | $ 214,245 | $ 275,310 | $ 353,970 | $ 422,280 | $ 510,255 | $ 652,050 | $ 703,800 | $ 652,050 | 894,240 |
| **MTPCS Direct Retail Rev.** | | | | | | | | | | | |
| RetailSalesCost | $ | $ 202,400 | $ 186,208 | $ 153,824 | $ 145,728 | $ 137,632 | $ 137,632 | $ 161,920 | $ 161,920 | $ 145,728 | 194,304 |
| AccessoryCost | $ | $ 5,280 | $ 4,858 | $ 4,013 | $ 3,802 | $ 3,590 | $ 3,590 | $ 4,224 | $ 4,224 | $ 3,802 | 5,069 |
| Inventory COGS | | | | | | | | | | | |
| MetroDealer Service Payments | $ 199,008 | $ 251,250 | $ 231,150 | $ 190,950 | $ 180,900 | $ 170,850 | $ 170,850 | $ 201,000 | $ 201,000 | $ 180,900 | 241,200 |
| TmobileDealer COMMISSION PAYOUTS | $ 153,866 | $ 185,000 | $ 185,000 | $ 195,000 | $ 195,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | 200,000 |
| **Total COG** | $ 674,959 | $ 812,118 | $ 821,461 | $ 819,097 | $ 879,400 | $ 934,352 | $ 1,022,327 | $ 1,219,194 | $ 1,270,944 | $ 1,182,480 | 1,534,813 |
| **GROSS PROFIT** | $ 183,021 | $ 284,732 | $ 290,018 | $ 266,950 | $ 271,124 | $ 279,084 | $ 289,411 | $ 321,235 | $ 327,310 | $ 311,116 | 369,904 |
| **Expenses** | | | | | | | | | | | |
| AUTO | $ 2,299 | $ 500 | $ 500 | 500 | | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | 500 |
| BANK FEE | $ 2,058 | $ 2,500 | $ 2,500 | 2,500 | | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | 2,500 |
| COMPUTER & INTERNET EXP | $ 800 | $ 2,000 | $ 2,000 | $ - | | $ - | $ - | $ - | $ - | $ - | - |
| LICENSE FEES | | | | | | | | | | | |
| MERCHANT FEES | $ 1,231 | $ 625 | $ 625 | $ 625 | $ 625 | $ 625 | $ 625 | $ 625 | $ 625 | $ 625 | 625 |
| OFFICE EXPENSE | $ 4,534 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | 2,500 |
| CorpPAYROLL | $ 80,587 | $ 80,000 | $ 80,000 | $ 110,000 | $ 110,000 | $ 110,000 | $ 110,000 | $ 110,000 | $ 110,000 | $ 110,000 | 110,000 |
| MetroRETAIL PAYROLL | $ 69,077 | $ 59,000 | $ 59,000 | $ 59,000 | $ 59,000 | $ 59,000 | $ 59,000 | $ 59,000 | $ 59,000 | $ 59,000 | 59,000 |
| TmobileRetail Payroll | $ 27,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | 25,000 |
| RENT | $ 2,509 | $ 2,900 | $ 2,900 | $ 2,900 | $ 2,900 | $ 2,900 | $ 2,900 | $ 2,900 | $ 2,900 | $ 2,900 | 2,900 |
| RENT RETAIL | $ 19,511 | $ 28,000 | $ 28,000 | $ 28,000 | $ 28,000 | $ 28,000 | $ 28,000 | $ 28,000 | $ 28,000 | $ 28,000 | 28,000 |
| REPAIRS | $ | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | 500 |
| LOAN PAYMENT | $ | $ - | $ - | | | | | | | | |
| SHIPPING | $ 1,691 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | 3,000 |
| SOFTWARE | $ 8,906 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | $ 6,500 | 6,500 |
| TELEPHONE & INTERNET | $ 1,106 | $ 2,082 | $ 2,082 | $ 2,082 | $ 2,082 | $ 2,082 | $ 2,082 | $ 2,082 | $ 2,082 | $ 2,082 | 2,082 |
| TRAVEL | $ 4,088 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | 3,000 |
| UTILITIES | $ 26,140 | $ 12,000 | $ 12,000 | $ 12,000 | $ 12,000 | $ 12,000 | $ 12,000 | $ 12,000 | $ 12,000 | $ 12,000 | 12,000 |
| INSURANCE | $ 13,502 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | 1,500 |
| CAPEX AND LEASEHOLD IMPROVEMENT | $ 28,124 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | 5,000 |
| PROFESSIONAL FEES | $ - | $ 15,000.00 | $ 25,000.00 | $ 25,000.00 | $ 15,000.00 | $ 15,000.00 | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | 5,000 |
| UST Fees | | | | $ | 4,875.00 | | $ 4,875.00 | | | | |
| Class 9 Payment | | | | | | | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 |
| Class 10 Payment | | | | | | | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 |
| Class 11 Payments | | | | | | | | $27,000 | | | |
| Class 5 Payments | | | | | | | $3,190 | $3,190 | $3,190 | $3,190 | $3,190 |
| **Total Expenses** | $ 293,161.55 | $ 251,607.00 | $ 261,607.00 | $ 294,482.00 | $ 276,607.00 | $ 279,607.00 | $ 278,719.34 | $ 273,844.34 | $ 300,844.34 | $ 273,844.34 | 273,844.34 |
| | | | | | | | | | | | |
| **Net Income** | $ (110,140.48) | $ 33,124.56 | $ 28,411.29 | $ (27,532.26) | $ (5,482.78) | $ (523.29) | $ 10,691.87 | $ 47,390.91 | $ 26,465.91 | $ 37,271.88 | 96,059.96 |

| 120% | 100% | 125% | 115% | 95% | 90% | 85% | 85% | 100% | 100% | 90% | 120% | 120% | 0% | 0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17-Dec | 18-Jan | 18-Feb | 18-Mar | 18-Apr | 18-May | 18-Jun | 18-Jul | 18-Aug | 18-Sep | 18-Oct | 18-Nov | 18-Dec | 19-Jan | 19-Feb |
| 1,026,972 | 855,810 | 1,069,763 | 1,050,680 | 922,887 | 926,357 | 924,044 | 973,195 | 1,202,760 | 1,260,585 | 1,186,569 | 1,651,482 | 1,720,872 | 1,720,872 | 1,720,872 |
| 224,717 | 187,264 | 234,080 | 215,354 | 177,901 | 168,538 | 159,174 | 159,174 | 187,264 | 187,264 | 168,538 | 224,717 | 224,717 | 224,717 | 224,717 |
| 63,022 | 52,518 | 65,648 | 60,396 | 49,892 | 47,267 | 44,641 | 44,641 | 52,518 | 52,518 | 47,267 | 63,022 | 63,022 | 63,022 | 63,022 |
| 16,896 | 14,080 | 17,600 | 16,192 | 13,376 | 12,672 | 11,968 | 11,968 | 14,080 | 14,080 | 12,672 | 16,896 | 16,896 | 16,896 | 16,896 |
| 257,366 | 214,472 | 268,090 | 246,643 | 203,748 | 193,025 | 182,301 | 182,301 | 214,472 | 214,472 | 193,025 | 257,366 | 257,366 | 257,366 | 257,366 |
| 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 |
| **1,597,473** | **1,332,644** | **1,663,680** | **1,597,765** | **1,376,305** | **1,356,357** | **1,330,628** | **1,379,779** | **1,679,594** | **1,737,419** | **1,616,570** | **2,221,983** | **2,291,373** | **2,291,373** | **2,291,373** |
| 919,080 | 765,900 | 957,375 | 940,298 | 825,930 | 829,035 | 826,965 | 870,953 | 1,076,400 | 1,128,150 | 1,061,910 | 1,477,980 | 1,540,080 | 1,540,080 | 1,540,080 |
| 194,304 | 161,920 | 202,400 | 186,208 | 153,824 | 145,728 | 137,632 | 137,632 | 161,920 | 161,920 | 145,728 | 194,304 | 194,304 | 194,304 | 194,304 |
| 5,069 | 4,224 | 5,280 | 4,858 | 4,013 | 3,802 | 3,590 | 3,590 | 4,224 | 4,224 | 3,802 | 5,069 | 5,069 | 5,069 | 5,069 |
| 241,200 | 201,000 | 251,250 | 231,150 | 190,950 | 180,900 | 170,850 | 170,850 | 201,000 | 201,000 | 180,900 | 241,200 | 241,200 | 241,200 | 241,200 |
| **1,359,653** | **1,133,044** | **1,416,305** | **1,362,513** | **1,174,717** | **1,159,465** | **1,139,037** | **1,183,025** | **1,443,544** | **1,495,294** | **1,392,340** | **1,918,553** | **1,980,653** | **1,980,653** | **1,980,653** |
| **237,820** | **199,600** | **247,375** | **235,252** | **201,588** | **196,893** | **191,590** | **196,754** | **236,050** | **242,125** | **224,230** | **303,430** | **310,720** | **310,720** | **310,720** |
| 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 |
| 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 |
| 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 |
| 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 |
| 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 |
| 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 |
| 2,082 | 2,082 | 2,082 | 2,082 | 2,082 | 2,082 | 2,082 | 2,082 | 2,082 | 2,082 | 2,082 | 2,082 | 2,082 | 2,082 | 2,082 |
| 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| $126.95 | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 | $126.95 |
| $920.39 | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 | $920.39 |
| $27,000 |  |  | $27,000 |  |  | $27,000 |  |  | $27,000 |  |  | $27,000 |  |  |
|  | $3,190 | $3,190 |  | $3,190 | $3,190 |  | $3,190 | $3,190 |  | $3,190 | $3,190 |  | $3,190 | $3,190 |
| **220,844.34** | **193,844.34** | **193,844.34** | **220,844.34** | **193,844.34** | **193,844.34** | **220,844.34** | **193,844.34** | **193,844.34** | **220,844.34** | **193,844.34** | **193,844.34** | **220,844.34** | **193,844.34** | **193,844.34** |
| **16,975.96** | **5,755.91** | **53,530.97** | **14,407.20** | **7,743.40** | **3,048.38** | **(29,254.13)** | **2,909.62** | **42,205.91** | **21,280.91** | **30,385.88** | **109,585.96** | **89,875.96** | **116,875.96** | **116,875.96** |

**Exhibit "B" to Disclosure Statement**

T-Mobile

| Customer | STATUS | Address |
|---|---|---|
| TPRS - Contact Communications Inc - Phoenix Ave | SUB | 3895 Phoenix Ave<br>Ft Smith, AR 72903 |
| TPRS - Contact Communications Inc - S Thompson | SUB | 1102 S. Thompson St<br>Spring Dale, AR 72764 |
| TPRS - Contact Communications Inc - 14th St. | SUB | 100 SW 14th Street Betonville, AR 72712 |
| TPRS - Media Total Service LLC | SUB | 4300 Buford Drive NE<br>Buford, GA 30518 |
| TPRS - Galaxy Wireless Inc - W Pioneer (CORP) | COMPANY OWNED | 2615 W Pionner Pkwy<br>Grand Prairie TX 75051 |
| TPRS - 1757 E Hebron Pkwy (CORP) | COMPANY OWNED | 1757 E Hebron Pkwy #100<br>Carrollton,TX 75010 |
| TPRS - 1403 N BELT LINE RD (CORP) | COMPANY OWNED | 1403 N Beltline RD Irving, TX 75061 |
| TPRS - Infinitas Ventures, LLC #1 | SUB | 931 S Main St Kernersville NC 27284 |
| TPRS - HJ Telecom, Inc CPD3661 | SUB | 2626 OLD Denton RD STE 216<br>Carrollton,TX 75007 |
| TPRS - Infinitas Ventures LLC #2 | SUB | 5603 West Friendly Ave<br>Greensboro, NC 27410 |
| TPRS - High Tech Wireless Plus Inc | SUB | 6139 Poplar Ave Memphis, TN 38119 |
| TPRS - Cell Rich Corporation | SUB | 2700 E Eldorado Pkwy #403<br>Little Elm, TX 75068 |
| TPRS - Media Total Service LLC | SUB | 2550 Pleasant Hill Rd<br>Duluth Ga 30096 |

45

**Exhibit "C" to Disclosure Statement**

| Company Owned Stores | Address | City | ST | ZIP |
|---|---|---|---|---|
| Metro PCS | 1702-A 4th Street | Lubbock | TX | 79403 |
| Metro PCS | 5408 4th Street | Lubbock | TX | 79416 |
| Metro PCS | 6302 Frankford Avenue | Lubbock | TX | 79424 |
| Metro PCS | 4921 34th Street | Lubbock | TX | 79410 |
| Metro PCS | 6002 Slide Road | Lubbock | TX | 79414 |
| Metro PCS | 671 Spartanburg Highway Ste D | Hendersonville | NC | 28792 |
| Metro PCS | 220 Hillcrest Drive Unit C | Laurens | SC | 29360 |
| Metro PCS | 1121 Hwy 9 Bypass ste 3 | Lancaster | SC | 29720 |
| Metro PCS | 124 Sigmon Road Unit #200 | Linclonton | NC | 28092 |
| Metro PCS | 8328-303 Pineville-Matthews Road | Charlotte | NC | 28226 |
| Metro PCS | 2020-B Crockett Road | Palestine | TX | 75801 |
|  |  |  |  |  |
| SUB-DEALER Distribution |  |  |  |  |
| Sub Dealer Name | Address | City | ST | ZIP |
| Table Top Communications LLCGA | 3907 Burns Road | Lilburn | GA | 30047 |
| Table Top Communications LLCGA | 1184 Hwy 155S | McDonough | GA | 30253 |
| Table Top Communications LLCGA | 2509 Redmond Circle | Rome | GA | 30165 |
| DM Communication Network | 3055 Austell Road | Austell | GA | 30126 |
| DM Communication Network | 4606 Ponce De Leon | Clarkston | GA | 30021 |
| DM Communication Network | 1430 Tifton Ave. North | Tifton | GA | 31794 |
| DM Communication Network | Satelite Blvd | Duluth | GA | 30096 |
| DM Communication Network | 104 Belair Rd. | Evans | GA | 30809 |
| INT Telecom | 18110 Midway Rd. Ste130 | Dallas | TX | 75257 |
| INT Telecom | 5910 Azle Avenue | Ft. Worth | TX | 76114 |
| A and M Mobile | 4305 Old Monroe | Charlotte | NC | 28226 |
| AL-Mes | 3206 West Davis Street | Dallas | TX | 75257 |
| Diverse Mobile | 2713 Lebonan Pike | Nashville | TN | 37915 |
| Metro Dealer Inc. | 91 Highland Crossing Suite 113 | East Ellijay | GA | 30540 |
| D8Technologies | 2502 S. Beltline Blvd. Suite S-300 | Grand Prairie | TX | 75052 |
| DM Communication Network | 1005 St. Patricks Drive | Perry | GA | 31069 |
| AL-Mes | 100 W. Pioneer Parkway | Arlington | TX | 76010 |

**Exhibit "D" to Disclosure Statement**

### BID PROCEDURES ON SALE OF MEMBERSHIP INTERESTS
### IN THE EVENT OF SALE BASED ON ABSOLUTE PRIORITY RULE

1. In the event the unsecured creditors do not vote as a class to accept Debtor's Plan and Debtor must satisfy the "absolute priority rule" as incorporated into 1129(b)(2)(B)(ii) (the "Triggering Event"), the membership interest in Debtor currently held by United Mobile Solutions Corp ("UMS Corp") shall be cancelled and 100% of such interest (the "New Interest") shall be reissued to the Winning Bidder (as defined below).   Upon the occurrence of the Triggering Event, KHC, LLC ("KHC") currently proposes to pay $500,000.00 ("KHC's Initial Bid") for the New Interest.   Any other interested party who desires to submit a bid may do so pursuant to the terms and conditions below:

 a. Bidders.  A "Bidder" shall be a person or entity who has delivered a written bid to the counsel for Debtor no later than 5:00 p.m. Eastern Time on June 15, 2017. For avoidance of doubt, KHC shall be deemed to be a Bidder and KHC's Initial Bid shall be deemed to be an initial qualified bid.

 b. Qualified Bid Requirements.   Qualified competing bids from a Bidder: (i) shall be for cash (ii) shall have no contingencies as to payment at Closing (other than entry of a final order approving the Plan[13]); (iii) shall be in an amount equal to or greater than KHC's Initial Bid plus $25,000.00 (iv) shall contain an acknowledgement that any such purchase of the New Interest is subject to the Plan and that the Reorganized Debtor shall be subject to the Plan upon entry of a Confirmation Order, and (v) shall be subject to the written approval of

---

[13] Debtor reserves the right to amend its Plan after the submission of the Qualified Bids. Qualified Bidders shall reserve the right to withdraw their Qualified Bid based upon any amendment or modification of the Plan prior to the entry of the Confirmation Order.

T-Mobile USA, Inc., Metro-PCS Texas, LLC and Metro PCS Georgia, LLC (the "T-Mobile Group") (collectively, a "Qualified Bid").

      c.      Approval by the T-Mobile Group. On June 16, 2017, the Debtor shall submit all Qualified Bids to the T-Mobile Group. The T-Mobile Group shall have until 12:00 p.m. June 23, 2017 to review and approve or reject the Qualified Bids and shall notify the Debtor of such approval or rejection by 1:00 p.m. on June 23, 2017.

      d.      Notice of Approval. On June 23, 2017 in between the hours of 2:00 p.m. and 5:00 p.m., the Debtor shall provide notice to the Bidders that have been approved by the T-Mobile Group of such approval ("Qualified Bidders") and that such Qualified Bidders may participate in the Auction as defined below.

      c.      <u>Auction</u>. If the Triggering Event occurs and a Bidder other than KHC submits a Qualified Bid that has been approved by the T-Mobile Group by the requisite deadline, the Debtor shall file a notice of Qualified Bidders scheduling an auction at 2:00 p.m. June 29, 2017 at the office of Jones & Walden, LLC (the "Auction"). The New Interest will be auctioned as single lot. Only Qualified Bidders (i.e. those who have previously submitted a Qualified Bid that has been approved by the T-Mobile Group) may participate in the Auction ("Qualified Bidders"). Qualified Bidders must participate in person at the Auction. Any Qualified Bidder making a bid at the Auction must provide evidence reasonably satisfactory to Debtor demonstrating the Qualified Bidder's financial ability to close and to consummate an acquisition of the New Interest for the amount of any bid made at the Auction. Debtor will announce at the

commencement of the Auction which Qualified Bid is the highest and best bid for the New Interest.  Qualified Bidders will have an opportunity to increase their bids at the Auction, and successive bids over the last highest and best bid at the Auction must be in increments of at least $25,000.00 for the first such bid and $25,000.00 thereafter.  At the conclusion of the Auction, Debtor shall determine the highest and best bid for the New Interest ("Winning Bidder").  No competing bids or offers shall be entertained by Debtor unless made in compliance with the terms of the bidding procedures approved by the Court.

e.    <u>Confirmation Hearing</u>.  The Confirmation Hearing shall be scheduled for July 15, 2017. Debtor shall present the Winning Bidder to the Bankruptcy Court at the Confirmation Hearing. The Winning Bidder shall be subject to the approval of the Bankruptcy Court and any right to purchase the New Interest shall be subject to Confirmation of the Plan.

2.    The closing of the sale to the Winning Bidder shall take place no later than fifteen (15) business days after the entry of the Confirmation Order ("Closing Date").

3.    The sale conducted pursuant to these bid procedures will be final with payment due in full upon closing via wire transfer or certified funds.   Debtor is providing no warranties expressed or implied, including, without limitation, warranties related to merchantability or fitness for a particular purpose.  Accordingly, the successful bidder will accept the New Interest purchased in "as is, where is, with all faults" condition.

**CERTIFICATE OF SERVICE**

I certify that on the date specified herein below I cause to be served a copy of the foregoing documents via first class United States mail in a properly addressed envelope with sufficient postage affixed thereto to ensure delivery upon the parties listed below:

Office of the United States Trustee
362 Richard B. Russell Federal Building
75 Ted Turner Drive, SW
Atlanta, Georgia 30303

This 16th day of May, 2017.

**JONES & WALDEN, LLC**

/s/ Cameron M. McCord
Cameron M. McCord
Georgia Bar No. 143065
21 Eighth Street, NE
Atlanta, Georgia 30309
(404) 564-9300
**Attorneys for Debtor in Possession**